UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

DIEGO PAVIA,

    **Plaintiff,**

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION, INC.,

    **Defendant.**

Civil Action No. 3:24-cv-01336
Judge William L. Campbell, Jr.
Magistrate Judge Alistair Newbern

**RESPONSE OF JOEL G. MAXCY TO MATTHEW BACKUS'S DECLARATION IN SUPPORT OF THE TO PLAINTIFF'S MOTION, IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

**November 30, 2024**

## I. Introduction

### A. Qualifications

1. My name is Joel G. Maxcy. I am an economist with expertise in the fields of sports business, industrial organization and labor economics. I hold a Ph.D. in economics from Washington State University. I am currently a full professor in the LeBow College of Business at Drexel University in Philadelphia, PA. I also serve LeBow as the Head of the Departments of Sport Business and General Business. I am, since 2015, the President of the International Association of Sports Economists (IASE). I have previously held full-time academic positions at Temple University, The University of Georgia, and Ithaca College, and I have held visiting faculty positions at CDES—Limoges University (France), Executive Masters in European Sports Governance (EU), and the Russian International Olympic University (Russia). I teach courses at the graduate and undergraduate levels in sports economics, sports labor relations, and intercollegiate athletics, including a master's level course on NCAA compliance.

2. My research expertise includes labor relations in sports, antitrust economics, industrial organization, and sport finance. My work has been supported financially by grants, from among others, the Erasmus Program of the European Commission. I co-authored a 2023 book on intercollegiate athletics, *The NCAA and the Exploitation of College Profit Athletes,* University of South Carolina Press. I have published numerous peer-reviewed articles appearing in journals and books including in *Contemporary Economic Policy*, *Journal of Sport Economics, Review of Industrial Organization, Journal of Sport Management, Managerial and Decision Economics*, and others. I have made public appearances and delivered lectures at national and international conferences and forums on sport policy. I frequently serve as a referee and reviewer for sport management and economics journals and conference presentations. I have coauthored several amicus briefs communicated to the courts on college and professional sports litigation. I have often provided expert witness and consulting services, most often to sports industry and sport law clients over the past twenty years. A copy of my CV is included in the appendix.

### B. Case Background

3. Plaintiff Diego Pavia contests National Collegiate Athletic Association's (NCAA) rules that govern eligibility for intercollegiate competition. Specifically, he is challenging NCAA eligibility bylaws that establish the number of seasons and years a football player is eligible to compete in NCAA intercollegiate athletics. Mr. Pavia claims the NCAA is in violation of antitrust law causing him anticompetitive harm because the Association's Division I eligibility rules count one season he spent competing in junior college (JUCO) football toward the total allowed number of seasons within which players can compete in NCAA Division I football. Mr. Pavia is seeking injunctive relief on behalf of only himself.[1]

### C. Assignment

4. I am retained by Mr. Ryan Downton, the counsel for Mr. Pavia as an economics expert to respond to the economic claims that Mr. Backus, representing the defendants, has presented in Exhibit 2, *Declaration in Support of Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction (*Declaration*)*. I respond specifically to the assertion made by Mr. Backus that the Plaintiff <u>has not</u> presented the evidence needed to show the challenged eligibility rules harm competition.

5. I have reviewed the Declaration, the *Complaint for Injunctive Relief, Diego Pavia v. National Collegiate Athletic Association* (Complaint), the *Memorandum in Support of Motion for Temporary Restraining Order and the Preliminary Injunction* (Memorandum), the NCAA's *Opposition to Plaintiff's Motion for Preliminary Injunction* (Opposition), as well as relevant economic literature and publicly available documents and data. The materials I have relied upon in completing this assignment are in the attached Appendix.

6. I will be compensated for my work at my consulting rate of $500 per hour. My compensation in this matter is not contingent on my opinion on this matter, the outcome of this injunction decision, or any other issue.

7. Like Mr. Backus, I am an expert in economics, not the law. My work and research in antitrust economics and labor relations often overlays the intersection of the two disciplines. I respond here to the economic substance of the analysis of Mr. Backus revealed in his Declaration and offer no opinion on the law.

---

[1] Complaint for Injunctive Relief, Diego Pavia v. National Collegiate Athletic Association, November 18,2024 ("Complaint").

## II. The NCAA Rules Challenged by the Plaintiff

8. The Declaration provides a summary of the NCAA's eligibility rules in its section III.[2] Mr. Backus reports that his description of rules is based on the Declaration of Jerry Vaughn, NCAA Director of Academic and Membership Affairs, and is also confirmed in the text of these rules as set out in public materials published by the NCAA. I am likewise familiar with these rules as put forth in the *NCAA Division I Manual, a*s I use the manual as a resource in my course on NCAA compliance. Moreover, it is understood that the NCAA's eligibility rules are the product of a cohesive set of bylaws governing participation in NCAA Division I sports, some of which are specific to football. Nonetheless, the Declaration's focus is exclusive to those bylaws challenged by Plaintiff. We agree that this is appropriate. The summary of the specific rules challenged by the Plaintiff and conveyed in the Declaration is paraphrased below.

9. The NCAA's eligibility rules are delineated in the Division I Manual, which governs NCAA Division I athletic competition. The eligibility rules outline the criteria for participation along several dimensions, including high school graduation status and minimum grade point averages. The Plaintiff is challenging those criteria for participation relating to years of eligibility and seasons of intercollegiate competition. The declaration's discussion of the NCAA's eligibility rules is specific to: (1) The "five-year" "four seasons of competition" rule; (2) the COVID waiver policy; (3) The "three year, non-qualifiers Rule"; and (4) The "redshirt rule." Numbers 3, and 4 are adjacently related to this case.[3]

10. Number 2 applies because the Plaintiff took advantage of the COVID waiver policy. The NCAA Division I Council approved an eligibility extension. The waiver restored a season of competition by excluding the 2020-2021 season from the four-season count and extended the total five years of eligibility to six years. Thus Mr. Pavia received an additional year of eligibility via the COVID waiver. However, this does not distinguish him from the many other NCAA Division 1 players who competed during the 2020-21 season and Mr. Pavia is not seeking preliminary injunctive relief based on the COVID waiver.

---

[2] Declaration of Matthew Backus, November 22, 2024, ¶12-22. ("Backus Declaration"),
[3] The Declaration states, "The non-qualifiers rule does not apply to Plaintiff, who met academic requirements, and was not at any point a "non-qualifier". "The "Redshirt Rule" is available to all student-athletes engaged in Division I intercollegiate football. Plaintiff has not availed himself of the Redshirt Rule because he has not competed in four contests or fewer in any of his seasons of Division I competition.".

11. Listed rule number 1, Bylaw 12.8, the "Five-Year, "Four Seasons of Competition" Rule, establishes that student-athletes "shall not engage in more than four seasons of intercollegiate competition in any one sport." Subordinate bylaw 12.8.1 states that a student-athlete, "shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution." The five-year window has some exceptions, including time spent "in the armed services" or "on official religious missions."[4] With respect to preliminary relief, Mr. Pavia is only seeking to enjoin application of the "Four Seasons of Competition Rule" as to himself to the extent it counts one season of JUCO competition against his permitted four seasons of NCAA Division I competition.

12. "The terms "intercollegiate competition" and "collegiate institution" referenced in Bylaw 12.8 are further defined in the bylaws of the Division I Manual. Bylaw 12.02.6, which Plaintiff seeks to enjoin in addition to the bylaws discussed above, defines "intercollegiate competition" as occurring when "a student-athlete in either a two-year or a four-year collegiate institution does any of the following: (a) Represents the institution in any contest against outside competition… (b) Competes in the uniform of the institution… or (c) Competes and receives expenses from the institution for the competition." Bylaw 14.02.4 defines "collegiate institution" as an "institution of higher education that: (a) Is accredited at the college level… (b) Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or (c) Is located in a foreign country."[5]

13. Thus, by the NCAA bylaws, a defined collegiate institution need not be an NCAA member. Nevertheless, the NCAA considers participation in athletics at such a defined institution equivalent to NCAA participation with respect to eligibility standards. Therefore, I am most concerned with addressing these bylaws, 12.8.1 and 12.02.6, as those carry the weight of the complaint and differentiates the experience of former JUCO athletes from all other NCAA athletes.

14. The issue here is that following the completion of the current 2024 football season, Mr. Pavia will have expended his eligibility as defined by the NCAA rules. Post COVID,[6] he competed for one year at the JUCO New Mexico Military Institute, two years at NCAA New Mexico State University and currently, by rule his last year of eligibility at Vanderbilt University. The primary argument put forth by the Plaintiff is that counting his 2021 JUCO year toward his NCAA eligibility maximum violates the Sherman Act (U.S. antitrust law).

---

[4] Backus Declaration, ¶14.
[5] Backus Declaration, ¶15.
[6] The NCAA's COVID-19 Waiver Relief means that the NCAA essentially ignores the existence of the 2020 season, which was marred by COVID, for all athletes.

## III. Summary of the Declaration's Arguments

15. The declaration uses *Rule of Reason* antitrust analysis and makes the recognized point that the terms anticompetitive harms and procompetitive benefits have specific meaning in antitrust economics. Rule of Reason analysis is broken down into three steps.[7] The first step requires the plaintiff to allege and prove an anticompetitive effect within a legally cognizable relevant market. If an anticompetitive effect is determined, step two shifts the burden to the defendant to show that the procompetitive merits of the conduct outweigh its anticompetitive properties. The third step requires the court to determine if the effect could be achieved through an alternative means that is less restrictive on competition.

16. The Declaration summarizes Mr. Backus's opinions in its section II.[8] The Plaintiff's claims are that the challenged NCAA eligibility rules are an unlawful restraint on trade, which impose *anticompetitive harms* on Diego Pavia and similarly situated athletes, those who likewise spent part of their NCAA eligibility as JUCO football players. The Plaintiff further claims there are no compensating *procompetitive benefits* offered by this eligibility restriction or that any such benefits could be accomplished by less restrictive means. Mr. Backus argues that the Plaintiff does not substantiate his arguments regarding presence or absence of either anticompetitive harms or procompetitive benefits with economic analysis. Specifically:

> "a. Plaintiff's claims of anticompetitive harms are actually claims about harms to a competitor—Diego Pavia—not harms to the competitive process. An opportunity lost for Diego Pavia is an opportunity gained for Vanderbilt Football's next quarterback. These zero-sum claims do not substantiate an argument for anticompetitive harms, which require demonstrating effects on market price, quantity of output, or quality of output.
>
> b. Plaintiff's claims that there are no procompetitive benefits of the eligibility restrictions ignore obvious counterarguments. Eligibility restrictions in NCAA sports create a differentiated athletic product, in turn creating a unique opportunity for student-athletes to compete while pursuing a four-year degree. Absent the at-issue eligibility rules, the NCAA student-athlete experience could be substantially degraded."[9]

17. The declaration also advises that the Plaintiff's proposed injunctive relief has implications far beyond NCAA Division I Football. According to Mr. Backus, these repercussions are not considered by Plaintiff's complaint or memorandum and a complete argument would require detailed, market-by-market analysis, due to substantial differences across intercollegiate sports.

---

[7] See for example Baker, T.A., Maxcy, J.G., & Thomas. C. (2011). Whether the NCAA will continue to Circumvent Antitrust Regulation in the Wake of *White v. NCAA*. *Journal of Legal Aspects of Sport*, 21(1), 75-100.
[8] Backus Declaration, ¶ 9-11.
[9] Backus Declaration ¶ 10.

18. In the next sections of this response I counter each of these arguments based on my understanding of the economic ramifications of antitrust law.

## IV. Refutation of the Declaration's Arguments

### A. The Anticompetitive Harms are Imposed on Total Economic Welfare

19. The Declaration's argument centers on the point that the economic harm imposed by the eligibility rule is limited to the Plaintiff, who would lose all benefits he may acquire with an additional season as the Vanderbilt quarterback. Included in these benefits is the recently attained right of NCAA athletes to attain compensation for marketing their Name, Image and Likeness (NIL).[10] One year's NIL for a star quarterback in a major NCAA conference (the SEC in this case) is likely significant, perhaps more than $1 million. In addition, there are reputational and publicity benefits gained by playing a primary position (quarterback) at an NCAA major conference university that likely extend beyond the direct financial returns. For example, increasing the probability of an opportunity to play professional football at the highest competitive level, the National Football League (NFL) or a lower-level professional football league.

20. Mr. Backus argues that NCAA eligibility rules are a zero-sum game. When one player's eligibility is ended a roster spot opens for a new player. One NCAA football player's completion of his eligibility creates a roster opening for another incoming player. The first player's loss is offset as the new player's gain. The net benefit is thus exactly zero. Therefore, no overall welfare loss is imposed given the NCAA's eligibility rule. I maintain that this is not true. In fact, there are significant welfare losses given inefficiencies put upon the full labor market for college football players due to enforcement of this eligibility rule and this will be clarified below.

21. The Declaration further advises that anticompetitive harm must be shown to result in reductions in <u>total welfare</u> given limitations on competitive behavior. "Anticompetitive harm can be identified through increase in price above the competitive level, and reductions in output and quality below the competitive level. Representative is collusive coordination among competitors that increases their profitability but diminishes total consumer welfare. However, rule of reason criteria advises that not all limits on competition or coordination between competitors are necessarily anticompetitive."[11]

22. The case is made that if Mr. Pavia is not granted an additional year of eligibility that his loss is simply offset by the benefit gained by his replacement and there is no effect on overall welfare, thus cannot reflect anticompetitive harm. I contend that the given eligibility restraint negatively impacts overall welfare in multiple ways. First, the NCAA rules deliberately limit the options for all potential incoming football players, most often from high school, and the broader subset of entering NCAA athletes. Second, because

---

[10] See Coello, S. (2024) "What is NIL in college sports? How do athlete deals work?" *ESPN.COM*. Retrieved November 29, 2024, from https://www.espn.com/college-sports/story/_/id/41040485/what-nil-college-sports-how-do-athlete-deals-work
[11] Backus Declaration, ¶25.

junior college football players historically make up two-thirds of the market for transfers to Division I Football Bowl Subdivision ("FBS") schools, with 10% of NCAA Division I FBS new roster spots attributable to junior college transfers in 2019,[12] removing them from the supply market for college football players (with respect to one or two years of their potential eligibility) represents evidence of an "actual detrimental effect" on the market as a whole. _____

23. The NCAA dominates the labor market for incoming college football players, essentially it has created for itself an economic monopsony in the labor market for college football players, especially those with professional aspirations and the athletic skills needed to compete at an elite level, represented by NCAA Division I. The NFL does not permit new entrants until a time at least one year beyond their high school graduation date, pushing talented players toward some form of higher education for at least one year.[13]

24. The entering football player's only participation alternatives to non-NCAA colleges are the NAIA and JUCO. The NAIA offers its student athletes the opportunity to earn a four-year college degree, so competes directly with the NCAA in the labor input market for football players. However, the NAIA has lost more than 50% of its membership since the mid 1970s, most converting to NCAA Division II or Division III affiliations.[14] It is not a realistic challenger to the NCAA monopsony any more than the Canadian Football League (CFL) is a threat to the NFL.

25. The primary option beyond the NCAA for prospective college football players thus is junior college.[15] JUCO's offers talented athletes, who often may be deficient either academically or in terms of competitive experience and physical development, a direct pathway to the NCAA and then the NFL. However, as stated above by NCAA rules, each season of JUCO participation costs a football player one season of NCAA eligibility. The National Junior College Athletic Association ("NJCAA") has no affiliation or formal legal relationship with the NCAA.[16] Yet the NCAA considers JUCO participation as equivalent to NCAA participation regarding eligibility limits.

26. NCAA Division I members compete directly with the NJCAA schools for potentially high-level or elite football talent. JUCO is consequently the primary direct competitor to the NCAA for top-level entering football talent. Notwithstanding, there is also an informal cooperative relationship between JUCOs and the NCAA member institutions. Those

---

[12] https://www.ncaa.org/sports/2017/8/3/transfers-in-division-i.aspx?print=true (Last visited Nov. 26, 2024).
[13] FindLaw Clarett v NFL. Retrieved November 29, 2024 https://caselaw.findlaw.com/court/us-2nd-circuit/1111241.html
[14] Yurman, undated. Retrieved from https://naiatoncaa.wordpress.com/article/ November 28, 2004.
[15] The term "junior college", abbreviated JUCO throughout this report, comprises the collection of 2-year institutions of higher education in the United States. Thses colleges are also known as community colleges and technical institutes or technical colleges. These institutions typically award an associate's degree (A.A. or A.S.) to students upon completion of their academic programs. They may also offer certificate programs but do not offer four-year (bachelor's) degrees.
[16] Memorandum In Support of Motion for Temporary Restraining Order and Preliminary Injunction, Diego Pavia v. National Collegiate Athletic Association, November 8, 2024. p5. ("Memorandum ISO Preliminary Injunction"),

8

players who do not qualify academically for NCAA participation, may qualify subsequently by completing a 2-year JUCO degree.

27. The NCAA's eligibility rules tip the recruiting advantage for those at the academic and athletic margins to the NCAA. This comes at the expense of the many potential football players considering their best athletic/educational options. NCAA Division I competition offers a football player significant advantages over JUCO football. Greater exposure and better coaching increase the probability of a professional career. Additionally, the new NIL allowances imply the exposure gained by attending an NCAA Division I college offers considerable financial advantages in comparison to JUCO. Thus, when confronted with a choice of four years to play in the NCAA versus two years in JUCO and only two more in the NCAA, the four-year NCAA option is often better choice for those who, fresh from high school, and who qualify both academically and in terms of athletic potential. Notwithstanding, the option of two JUCO years followed by four years at an NCAA institution may actually be the best option for many high school athletes at the academic and athletic margins. However, the rule requiring forfeit of NCAA eligibility given JUCO participation discounts that choice.

28. The twofold requirement that NCAA athletes be: (1) properly disposed for athletic competition; and (2) academically qualified per the NCAA's Proposition 16[17] provides an important cooperative function for JUCOs, and especially for football where physical maturity and development is critical. A potential college football player may not, at age 18, be athletically ready for the highest level of college competition, but there is no regulation preventing enrollment at an NCAA school. Conversely, academically non-qualifying high school athletes must attain NCAA academic eligibility to enroll. Graduating from a 2-year JUCO, conditioned on taking the appropriate classes is a standard way to earn academic qualification.[18] However, those taking this route also forfeit eligibility if they compete on their JUCO team. However, JUCO may also be a better academic option for those who qualify but are not necessarily prepared for the academic demands of a four-year college. They may have academic deficiencies or simply lack the maturity to make good decisions about academic programs or their future careers. In many ways JUCOs are better equipped than four-year colleges and universities to accommodate such students.

29. Meanwhile athletic skills and physiques can also be developed playing JUCO football so that an undersized and under skilled 18-year-old player may upgrade athletically to Division I ability. As mentioned above this is particularly important in football, where size and strength, which can be significantly augmented for males after age 18, are critical components of a football player's capacity for success. Many football players who started their college careers in JUCO have moved to NCAA Division I and then to the NFL, including current and recent stars like Aaron Rodgers, Tyreek Hill, LaVonte Davis, Cam Newton, and numerous others.[19]

---

[17] Prop 16 requires incoming freshman athletes meet a sliding scale minimum for GPA and standardized test benchmarks and high school curricular requirements to be eligible for participation in NCAA sports.
[18] See NCAA Guide for Two-Year Transfers 2024-25. P 11-12. Retrieved November 28, 2024 from http://fs.ncaa.org/Docs/eligibility_center/Transfer/TwoYearGuide.pdf
[19] Horowitz, A. 2024. "The Best JUCO Players in NFL History" Retrieved November 28, 2024 from https://jokermag.com/juco-nfl-players/#best-juco-football-players-currently-in-the-nfl

9
Case 3:24-cv-01336    Document 33-1    Filed 12/02/24    Page 9 of 18 PageID #: 896

30. Rather than opt for a JUCO, which eliminates 2 years of NCAA eligibility, a qualified but academically or athletically marginal player may choose the NCAA and 4 years of NCAA eligibility, often including an initial redshirt year. The Five-Year Rule (Bylaw 12.8) breaches the Sherman Act by starting each athlete's eligibility clock while the athlete is attending non-NCAA institution. The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level as commensurate with the opportunity to earn exposure opportunities including NIL compensation while playing NCAA Division I football. The restraint further violates the Sherman Act by taking a year of NCAA Division I football and earning potential away from athletes as penance for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA Division I institution. The eligibility bylaws induce potential football players to attend NCAA institutions when a JUCO school may be in their best interest, both academically and for development of their athletic potential.

### B. Application of the Sherman Antitrust Act to the NCAA Monopoly

31. The NCAA is an organization comprised of member institutions, which represent very separate legal entities. The NCAA collectively, through cooperative agreements among its members, determines exactly what constitutes the eligibility rules for student athletes. The arguments of the years-to-play limit is set so that no member institution may offer more years of eligibility than the NCAA specified rule. Section 1 of the Sherman Antitrust Act makes illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" (15 U.S.C. § 1, 2010). The main purpose of Section 1 of the Sherman Act is to prevent independent businesses from uniting to interfere with the free market.[20] However, not all contracts that restrain competition will be found to violate Sherman Section 1; and courts will determine whether a particular arrangement violates Section 1 of the Sherman Act. The Supreme Court has long-since held that Section 1 prohibits only "unreasonable restraints of trade".[21]

32. The regulations imposed the NCAA, that restrict competition for the services of athletes generally characterize horizontal agreements. Horizontal restraints involve agreements between direct competitors, at the same level in a particular industry, to reduce competition.[22] The regulations imposed by sports leagues, including the NCAA, that restrict competition for the services of athletes and coaches thus represent horizontal agreements that may violate the Sherman Act.[23]

---

[20] Sullivan, E.T. and Harrison, J.L. (1998), *Understanding antitrust and its economic implications.* 3rd edition. New York: M. Bender
[21] *Chicago Board of Trade v. United States*, 1918, p. 238
[22] Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717 (1988)
[23] E.g., *Smith v Pro Football Inc.* 1978, *Mackey v. NFL*, 1977, *Law v. NCAA*, 1998.

33. Because the challenged eligibility restriction is targeted directly at certain athletes who participated at the JUCO level, and not those who competed, for example, at a prep school, in other sports, joined the Armed Services, or otherwise delayed their NCAA participation, this rule comes very close to a "group boycott", a *per se* antitrust violation of the Sherman Act. But because the rule does not prevent other colleges from competing with the NCAA, it is more properly analyzed under the Rule of Reason, as the D.C. Circuit Court did when determining the NFL Draft violated the Sherman Act because it only allowed athletes to negotiate a salary with one NFL club. *Smith v. Pro Football Inc.*, 593 F.2d 1173 (D.C. Cir. 1978).[24]

34. In conclusion, those harmed by the eligibility rules are, at a minimum, the class of all potential football players who are only marginally prepared, either athletically or academically for NCAA Division 1 football. The harm is imposed on total economic welfare as decisions regarding both education and athletic participation may result in choices that are inefficient. The NCAA monopoly/monopsony facilitates the imposition of these rules and as such the rules represent a conspiracy to restrain trade among the member schools, a violation of the Sherman Act, Section 1.

### C. Procompetitive Benefits are Much Less than as Described in the Declaration

35. Repeating from above, Mr. Backus claims that "eligibility restrictions in NCAA sports create a differentiated athletic product, in turn creating a unique opportunity for student-athletes to compete while pursuing a four-year degree. Absent the at-issue eligibility rules, the NCAA student-athlete experience could be substantially degraded."[25] The declaration argues that "The challenged rules protect college athletics which provides the recognized procompetitive benefit of expanding total output…procompetitive benefits should be evaluated in terms of market-wide outcomes and the benefit to all relevant market participants."[26]

36. The declaration's evaluation of procompetitive benefits may in fact disclose additional anticompetitive outcomes. The NCAA purposely conflates education product, consumed in lieu of monetary payment by the student athletes and the entertainment product the athletes produce. The input market by which the student athletes supply their (labor) services as athletes in exchange for a grant-in-aid scholarship is entangled with the product market where the student athletes are at once consumers of the universities' educational product.

---

[24] Retrieved November 28, 2024 from https://casetext.com/case/smith-v-pro-football-inc
[25] Backus Declaration ¶10.
[26] Backus Declaration, ¶28.

37. The declaration states "In the context of the challenged rules, a proper assessment of procompetitive benefits may include an evaluation of increased output—both in terms of the quantity of opportunities for high-level athletic competition and the quality of those opportunities for student-athletes—as well as an overall expansion of output. Indeed, while the challenged rules restrict individual student-athlete eligibility for NCAA competition, such rules create the differentiated market for NCAA Division I Football for players who seek to compete in such an environment."[27] This is exactly the entanglement I describe. Expanded benefits may be due to better educational opportunities because NCAA institutions are superior educators relative to JUCOs. Otherwise, they could also be enhanced due to a better and more highly demanded entertainment product so that the games are played by proper college students who prioritize education over an employment relationship. However, neither of these assertions is true.

38. The advantage of a directly pursuing four-year college degree following high school may well be that case for those athletes who are both intellectually and athletically capable. No one would suggest that one who has been recruited and admitted from high school to an elite NCAA institution like Stanford, Northwestern, or Vanderbilt consider a JUCO option to improve either their long-term athletic or educational outcomes. Nonetheless, for marginal athletes and scholastic performers the JUCO option may enhance both prospects, and if participation did not remove NCAA eligibility JUCO enrollment and participation in athletics while there would be a more appealing option for such student athletes.

39. To diminish the contribution of a JUCO education in context of the full university experience contradicts NCAA policy (Prop 16) rules for academic non-qualifiers. To become qualified, a student using JUCO for remedial purposes must graduate from their two-year program. This implies the NCAA believes the value of JUCO education is not only satisfactory but necessary to demonstrate the capability for academic success at an NCAA institution. However somehow this value does not apply for students who have demonstrated qualifying but only slightly better high school GPAs and standardized test scores.

---

[27] Backus Declaration, ¶30.

12
Case 3:24-cv-01336    Document 33-1    Filed 12/02/24    Page 12 of 18 PageID #: 899

40. The Declaration implies that directly entering the NCAA, as opposed to transferring from a JUCO, improves the holistic quality of the student's educational experience.[28] Moreover, he says that by not punishing JUCO participation, potential NCAA athletes will be more inclined toward JUCOs to augment their athletic value at the expense of the better educational opportunities at NCAA schools. Nonetheless, is it not logical that two years in JUCO followed by an additional four years at a university is a better option than only two years at the university? Often the student is without a scholarship for the additional years that are often needed to complete the bachelor's degree. The US Department of Education's college graduation statistics are based on a 6-year period from entrance date to graduation.[29] The six-year period an athlete requires to complete both and JUCO associate degree and a bachelor's degree from an NCAA institution is precisely the same time as that a typical student takes to earn the same bachelor's degree. Furthermore, taking more time to compete a degree is normal for a student working a fulltime job and the time commitment of competing in intercollegiate football is comparable to a fulltime job.

41. Mr. Backus claims that the challenged rules better preserve the alignment of academic (four years) and athletic (four seasons) careers and help student-athletes reach post-college careers efficiently.[30] The allusion that JUCO attendance is a hindrance to those students whose goal is at least a four-year degree, leading to a more meaningful career opportunities, can be attributed to possible existence of a "community college penalty", which submits that students who initially enroll in a community college are less likely to complete a bachelor's degree than students who enroll directly in a four-year college or university.[31]

42. Turk (2018) puts forth that studies revealing evidence of the community college penalty were faulty, either lacking proper controls or not accounting for selection bias. His quite thorough econometric study's results indicate that a student earning an associate degree prior to transferring to a four-year program had no statistically significant impact on the probability of earning a bachelor's degree. Regardless of whether a student earned an associate degree prior to transfer, the probability of completing a bachelor's degree was approximately 64 percent. He concluded that obtaining a bachelor's degree is dependent on factors other than whether a two-year degree is obtained prior to entering the program.[32] Contrary to the case put forward in the Declaration there is nothing to suggest that the JUCO education and athletic participation is detrimental to an athlete's ultimate educational experience at an NCAA college.

---

[28] Backus Declaration, ¶51.
[29] Undergraduate Retention and Graduation Rates. Retrieved November 29, 2024, from https://nces.ed.gov/programs/coe/indicator/ctr
[30] Backus Declaration, ¶53.
[31] Turk, J.M. (2018) The Impact of Earning an associate degree Prior to Transfer on Bachelor's Degree Completion. American Council on Education. Retrieved November 29, 2024, from https://www.acenet.edu/Documents/The-Impact-of-Earing-an-Associate-Degree-Prior-to-Transfer.pdf
[32] Ibid, Turk (2018) p. 9-10.

43. The second procompetitive benefit offered is that the eligibility limit on JUCO transfers differentiates the NCAA football product from the professional football. The college sports product, football played by amateur college students of an appropriate age is what makes this version of the sport popular with its fan/consumers and offers the fans with such preferences an option other than professional football. Therefore, maintenance of the NCAA version of the product is procompetitive as it enhances overall consumer welfare.

44. It is routinely suggested by the NCAA that court mandated policy changes such as the more liberal eligibility and academic rules, compensation allowances, classification of student athletes as employees, etc. diminishes the differentiation of the college product from the professional versions of their sports. This blurring of the line between college and professional in turn will reduce demand for, and consequently the revenue produced by, NCAA sports. Universities will be compelled to scale back their sport offerings, and ultimately the opportunities for college football players to compete at the elite levels of this college sport are reduced. The eligibility rules, which help, differentiate the NCAA product from professional football, are therefore procompetitive, if one accepts this argument on its face.

45. The claim is derived directly from the NCAA bylaws providing credence: "A basic purpose of this Association is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body and, by so doing retain a clear line of demarcation between intercollegiate athletics and professional sports".[33] Prior to the United States Supreme Court decision in the *Alston* case, the educational linkage made courts reluctant to challenge the Association's internal rules governing the amateur status of athletes. The NCAA has made a convincing effort to sufficiently entangle athletics and education so that the existence of a relevant market for athletic services cannot be effectively separated from the educational mission. However, rules restricting compensation have been, since no later than 2015, subjected to more thorough judicial review.[34]

---

[33] NCAA Division 1 Manual 1.3.1.
[34] O'Bannon v. NCAA 802 F.3d, 1049,1053 (9th Cir. 2015),
  and NCAA v. Alston, 141, S.Ct. 2141, 2153 (2021).

46. The Declaration extends the case for the benefit of product differentiation to the challenged eligibility restrictions.[35] Presumably NCAA football consumers prefer age-appropriate college athletes (according to the Declaration). If former athletes were permitted two additional years of eligibility, they would, it's argued, crowd out younger athletes from roster spots. Eliminating the challenged rules would skew NCAA athletes older, and likely more skilled, rendering NCAA teams more comparable to their professional counterparts than with the eligibility rules in place. Notwithstanding, empirical studies have shown that when amateur rules were relaxed to allow some compensation, demand for NCAA football was not diminished as the NCAA claimed would be the case.[36] There is likewise no reason to believe that reduced demand would follow if the challenged rules were abolished. Furthermore, if providing adequate opportunities for younger, less skilled players is the objective, there are certainly less restrictive methods to realize this goal.

47. The Declaration also argues that the NCAA membership does not attain a financial benefit from this restriction. This assumes that the compensation provided to the incoming replacement is identical, and that is exactly what is claimed. However, this is a new NIL era, and more relaxation of compensation restrictions going forward is expected, where the highest level of NCAA football conferences, the so-called Power 5 which includes Vanderbilt, will directly provide athletes compensation.[37] This suggests that an outgoing star would be considerably more costly to the school than an incoming player. There is doubtless a financial advantage in moving older players out and replacing them with younger players. It is not a zero-sum proposition.

48. The NCAA and its membership benefit from the churn of players. Besides the financial benefit that, incoming players are less expensive that their incoming replacements, the turnover provides control that would be eroded in the absence of regular turnover. The longer players stay, the less naïve they become toward rules and policies imposed by the NCAA, and their own athletic departments, and their coaches. Older players will demand not to be treated as children and will be more difficult to command. Moreover, older players are more likely to be leaders and perhaps organize the players toward group actions, for example unionization. Collectively older players are a greater threat to on-campus oversight and to the entire NCAA. The Association acts in their best interests, both short and long-term, by enforcing rules promoting turnover.

---

[35] Backus Declaration, ¶57-62.
[36] See Baker, T. A., Edelman, M., Watanabe, N. M. Debunking the NCAA's Myth That Amateurism Conforms with Antitrust Law: A Legal and Statistical Analysis. *Tennessee Law Review* 85. 2017-18, pp. 661-675.
[37] Murphy, D. & Thamel, P. (2024) NCAA, Power 5 agree to deal that will let schools pay players. *Espn.com*. Retrieved November 29, 2024 from https://www.espn.com/college-sports/story/_/id/40206364/ncaa-power-conferences-agree-allow-schools-pay-players

15
Case 3:24-cv-01336   Document 33-1   Filed 12/02/24   Page 15 of 18 PageID #: 902

### D. Less Restrictive Alternatives

49. The third step in Rule of Reason analysis requires that the court determine if the desired effect could be achieved through an alternative means that is less restrictive on competition. The Plaintiff proposes a simple alternative: count only NCAA seasons toward the four-season competition limit. Plaintiff also suggests adding a fifth year of eligibility for all athletes and upgrading academic support for athletes, but these latter options are not the focus of the request for preliminary injunctive relief. Mr. Backus states that with this proposal the plaintiff has not offered a less restrictive path to achieving the same procompetitive benefits.

50. Backus again focuses on the procompetitive value of the differentiated product. The Plaintiff offers counting only NCAA seasons of competition as "seasons of competition" as the less restrictive solution. Yet, it's argued in the Declaration that this is inconsistent with the NCAA as an organization of universities, which are defined as four-year colleges and universities.[38] It is not clear that the additional year of eligibility disrupts whatever procompetitive advantages are gained from the concept of a differentiated product. Nor is there anything but speculation that not counting JUCO years as "seasons of competition" would infringe on consumer demand.

51. As indicated above, from US Department of Education data, six years from entry to graduation is so common for all students that it is used to track graduation rates. Likewise, there are plenty of older student athletes who arrived late, or disrupted their educations, for reasons other than JUCO attendance, and do not have their eligibility curbed. The example of former minor league baseball player Chris Weinke who began his NCAA football career, after his baseball experience, at age 24 is provided in the initial Complaint and addressed in the Declaration.[39] The presence of some players who are slightly older does not appear to formulate a more professional-like product or impact demand. There is no reason to expect nor does any history to suggest that omitting junior college seasons of competition from the four-season NCAA limit would have any impact on consumer behavior.[40]

---

[38] Backus Declaration, ¶ 68.
[39] Backus Declaration, ¶ 68.
[40] For example, the COVID waiver policy granted an extra year for many athletes, with no apparent reduction in the demand for NCAA football.

## V. Conclusion

52. The Plaintiff is harmed significantly by the NCAA rule that limits eligibility for those athletes who competed in JUCO sports. He claims and the regulations limiting his eligibility and denying him an additional season at Vanderbilt University are an antitrust violation of the Sherman Act. Mr. Backus's declaration on behalf of the NCAA disputes the claim on the basis that an antitrust violation must show anticompetitive harms exceeding procompetitive benefits, and he argues the Plaintiff does not adequately make this case.

53. The economic clarification of anticompetitive harms necessitates that they extend beyond the cost to a given individual and extend to the broader market. I contest the point made in the Declaration that there is only harm to the Plaintiff and thus no anticompetitive market effect. The challenged rule brings about inefficiencies to the market for entering college football players. The eligibility rule, counting JUCO participation against the NCAA allocation, provides potentially entering players a greater incentive to choose an NCAA institution instead of a JUCU college. But for the regulation the JUCO may well be the athlete's better choice.

54. The procompetitive benefits offered by Mr. Backus, to be weighed against the anticompetitive harms, are primarily that the eligibility among other rules differentiates the NCAA football product from professional leagues, arguing this differentiation is critical to maintaining consumer demand for the product. This demand in turn generates more opportunities for college athletes than would be the case with an otherwise indistinguishable product from professional sports. Nonetheless, this argument has been largely debunked in other legal challenges to NCAA amateurism rules and that same reasoning applies to their eligibility regulations.

55. The NCAA membership benefits financially from the churn of athletes entering and exiting. The turnover also facilities the NCAA a level of excessive control and authority over its athletes that extends to the campus administrators of athletics. Forcing premature exits mitigates the leverage advantages older athletes acquire with experience and seniority. The eligibility rules advance the churn. A simple extension of eligibility so as not to count JUCO experience is reasonable and seems to be a minor change that would benefit a subset of NCAA athletes at little cost.  As compensation rules for athletes has shifted in their favor and there is a greater push for athletes' organization including unionization, the NCAA is more adamant than ever to protect its interest by promoting churn and limits on eligibility. That more than any other factor is their motivation for not conceding on this rule.

## VI. Signature

I certify that, to the best of my knowledge and belief:

• The statements of fact in this report are true and correct.

• The reported analyses, opinions and conclusions are limited only by the reported assumptions and are my personal, unbiased and professional analyses, opinions and conclusions.

• I have no personal interest or bias with respect to the parties involved.

• My compensation is not contingent on an action or event resulting from the analyses, conclusions or opinions of this report.

Joel G. Maxcy declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the preceding is true and correct.

Signed 1 December 2024, in Philadelphia, PA

_____
Joel G. Maxcy