# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

**DIEGO PAVIA,**                                            )
                                                           )
      **Plaintiff,**                               )
                                                           )    **NO. 3:24-cv-01336**
**v.**                                                     )
                                                           )    **JUDGE CAMPBELL**
**NATIONAL COLLEGIATE ATHLETIC**                           )    **MAGISTRATE JUDGE NEWBERN**
**ASSOCIATION,**                                           )
                                                           )
      **Defendant.**                               )

## MEMORANDUM

Pending before the Court is Plaintiff Diego Pavia's ("Pavia") Motion for Preliminary Injunction seeking to enjoin Defendant National Collegiate Athletic Association ("NCAA") from enforcing certain bylaws governing eligibility to preclude Pavia from playing in a fourth year of NCAA Division I college football on grounds that enforcement of the eligibility rules violates Section 1 of the Sherman Antitrust Act. (Doc. No. 8). Defendant NCAA filed a response in opposition (Doc. No. 30), and Plaintiff filed a Reply (Doc. No. 33). The Court held a hearing on December 3, 2024.

For the reasons stated herein, Plaintiff's motion for preliminary injunction will be **GRANTED**.

## I.    BACKGROUND

### A.    The NCAA

The NCAA is a voluntary, self-governing association of approximately 1,100 four-year member schools throughout the United States that administers athletic competition for student-athletes. (Vaughn Decl., Doc. No. 30-1 at ¶ 5). It is the NCAA's mission to "provide student-

athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience … The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body." NCAA Division I 2024-25 Manual.[1]

The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines. (Vaughn Decl., Doc. No. 30-1 at ¶ 5). Of the NCAA's eleven hundred schools, approximately 350 schools and 180,000 student athletes compete in Division I. (*Id*. at ¶ 7). Generally, Division I teams are the most popular and attract the most money and the most talented athletes. *See National Collegiate Athletic Association v. Alston*, 594 U.S. 69, 79 (2021). Within Division I, the most popular sports are basketball and football. *Id*. The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenues each year. *See id.* at 79, 93 (observing that annual television rights for the March Madness basketball tournament brought in close to $1.1 billion in 2016, and the television deal for the FBS College Football Playoff was worth approximately $470 million in 2012).

## B.    NIL Compensation

At its inception, and for over a hundred years, the NCAA limited compensation of student athletes in an attempt to maintain amateurism across college sports.  In 2021, in response to the Supreme Court's decision in *Alston*, 594 U.S. 69 (2021), the NCAA drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ("NIL"). *See Tennessee v. Nat'l Collegiate Athletic Assoc*., 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024); *Ohio v. Nat'l Collegiate Athletic Assoc*., 706 F. Supp. 3d 583 (2023).

---

[1]    The Division I 2024-25 Manual is Exhibit 2 to Plaintiff's Verified Complaint. (*See* Doc. No. 1-2).

As explained by the court in *Tennessee*:

> [T]he NCAA's Interim NIL Policy went into effect, allowing student-athletes
> to engage in NIL activity and to be compensated accordingly. This change
> created a market for student-athletes' NIL, which quickly let to the creation
> of NIL collectives, e.g., "organizations created by alumni, boosters, or
> businesses with the purpose of providing NIL opportunities to their school's
> athletes." Kassandra Ramsey, *NIL Collectives-Title IX's Latest Challenge*, 41
> Cardozo Arts & Ent. L.J. 799, 801 (2023). The first known collective, the
> Gator Collective, launched merely two months after the NCAA's interim
> policy went into effect. *Id*. Since then, "approximately 200 NIL collectives
> have been created across several colleges and universities." *Id*. at 802.

*Tennessee*, 718 F. Supp. 3d at 760. In the years that followed, the total NIL market "has exploded

from $917 million in 2021-22 to an expected $1.67 billion in 2024-25 – with no signs of slowing

down." (*See* Compl., Ex. 1, "NIL at 3: The Annual Overdose Report" at 3). Although NIL

opportunities are available to all athletes, virtually all football-related NIL funds go to Division I

football players. (*Id*. at 4).

**C.     Eligibility Rules**

Since the founding of the NCAA, members schools and conferences have adopted rules to

determine the eligibility of student-athletes to participate in intercollegiate athletics. (Vaughn

Decl., Doc. No. 30-1 at ¶ 4). These eligibility rules (hereinafter the "NCAA Bylaws") include,

among other requirements, that the student-athlete meet initial eligibility standards, including high

school graduation and a minimum grade point average in a specified number of core courses, and

have their amateur status certified. (*Id*. at ¶ 16 (citing NCAA Division I Bylaws 14.3.1.1 and

12.1)).[2]

Following the change in Bylaws allowing NIL compensation and in response to anti-trust

litigation, the NCAA has made other changes to the Bylaws. The NCAA rescinded restrictions on

---

[2]     The Division I 2024-25 Manual is Exhibit 2 to Plaintiff's Verified Complaint. (*See* Doc. No. 1-2).

the eligibility of student-athletes to play following a transfer and restrictions on the ability of NIL collectives to engage in recruiting prospective athletes. It has also instituted a change in Bylaws concerning the eligibility of Canadian Hockey League players.[3]

At issue here are NCAA Bylaws that restrict the duration of a student-athlete's eligibility to compete to four seasons within a five-year period and the "counting" of time spent at junior colleges, which are non-NCAA institutions, toward the total eligibility time.[4]

NCAA Bylaw 12.8, includes a provision that is often referred to as the "Five Year Rule," which provides in relevant part, as follows:

> **12.8 Seasons of Competition: Five-Year Rule.** A student-athlete shall not engage in more than four seasons of intercollegiate competition in any one sport (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:
>
> **12.8.1 Five-Year Rule.** A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted. For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.
>
> > **12.8.1.1 Determining the Start of the Five-Year Period.** For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the

---

[3]   *See* Scott Wheeler and Corey Pronman, *NCAA votes to open up college eligibility to Canadian Hockey League Players*, The Athletic, Nov. 7, 2024 (filed on the record at Doc. No. 33-5); *Masterson v. National Collegiate Athletic Ass'n, et al.*, No. 1:24-cv-00754, Doc. No. 59 (W.D.N.Y. Nov. 15, 2024).

[4]   The NCAA has taken the position that neither the Five-Year Rule (NCAA Bylaw 12.8), nor the Three-Year Transfer Limitation (NCAA Bylaw 14.3.3) will preclude Pavia from playing football in the 2025-26 season. (*See* Def. Resp., Doc. No. 30 at 6-7, 10).

institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

The NCAA Bylaws define "intercollegiate competition" as follows:

**12.02.6 Intercollegiate Competition.** Intercollegiate competition is considered to have occurred when a student-athlete in either a two-year or a four-year collegiate institution does any of the following:

(a) Represents the institution in any contest against outside competition, regardless of how the competition is classified (e.g., scrimmage, exhibition or joint practice session with another institution's team) or whether the student is enrolled in a minimum full-time program of studies;

(b) Competes in the uniform of the institution, or, during the academic year, uses any apparel (excluding apparel no longer used by the institution) received from the institution that includes institutional identification; or

(c) Competes and receives expenses (e.g., transportation, meals, housing, entry fees) from the institution for the competition.

Finally, a "Collegiate Institution" is defined as follows:

**14.02.4 Collegiate Institution.** A collegiate institution (for purposes of NCAA legislation) is an institution of higher education that:

(a) Is accredited at the college level by an agency or association recognized by the secretary of the Department of Education and legally authorized to offer at least a one-year program of study creditable toward a degree;

(b) Conducts an intercollegiate athletics program, even though the institution is not accredited at the college level and authorized to offer at least a one-year program of study creditable toward a degree; or

(c) Is located in a foreign country.

The parties agree that these NCAA Bylaws (hereinafter the "Intercollegiate Competition Rules" or the "challenged rules"), taken together, allow a student-athlete to engage in collegiate athletic-competition for four seasons within five calendar years. The clock starts from the first day of classes of a term for which the student-athlete is registered for full-time study at a "collegiate

5

institution." A collegiate institution includes four-year colleges and two-year junior colleges, but does not include post-secondary educational institutions such as prep schools, even if such schools offer athletic opportunities.

## D. Diego Pavia

Diego Pavia is the starting quarterback at Vanderbilt University, which is a Division I institution in the Southeastern Conference. (Pavia Decl., Doc. No. 9-1 at ¶ 4). This season, with Pavia as quarterback, Vanderbilt has seen historic success – Vanderbilt beat both the University of Alabama and Auburn University – and the team will be playing in a bowl game for the first time since 2018. (*Id*.). Those familiar with college football appreciate this remarkable accomplishment. Pavia estimates that he could earn over $1 million in NIL compensation in the 2025-26 season. (*Id*. at ¶ 5). But under the current NCAA Bylaws, he is not eligible to play Division I football next season because he began his collegiate athletic career at a junior college.

Pavia's path to Vanderbilt is a winding one. He graduated from high school in 2020. (*Id*. at ¶ 1). With no offers to play Division I football, he enrolled in New Mexico Military Academy, a junior college.[5] (*Id*. at ¶ 2). Pavia played football for New Mexico Miliary Academy during the fall 2020 and fall 2021 seasons. (*Id*. at ¶ 3). He did not earn any NIL compensation during his time at New Mexico Military Academy. (*Id*. at ¶ 1).

Pavia obtained an associate degree from New Mexico Military Academy in 2022 and then transferred to New Mexico State University, a NCAA Division I member institution. (*Id*. at ¶ 3). He played football at New Mexico State University during the 2022-23 and 2023-24 academic years and was named 2023 Conference USA Offensive Player of the Year. (*Id*.). As a result, he

---

[5]  Junior Colleges are governed by the National Junior Collegiate Athletic Association ("NJCAA"), which, despite the similarity in name, has no affiliation with the NCAA. (Vaughn Decl., Doc. No. 30-1 at ¶¶ 11-12).

found there was additional demand for his services. (*Id*.). In 2024, after obtaining a bachelor's degree from New Mexico State he transferred to Vanderbilt University. (*Id*. at ¶ 3).

Pavia wants to play football in the 2025-26 season but has no remaining eligibility under the current NCAA Division I Bylaws. This is because his time at New Mexico Military Academy, a junior college that is not a member of any NCAA Division, "counts" as one year of collegiate athletic competition under the challenged rules.[6]

Pavia seeks relief in time for him to consider his options for next year, commit to a university, and negotiate NIL opportunities. The compressed timeframe is due to the limited window of the NCAA Transfer Portal. Generally, Division I football players can only transfer from one school during the twenty-day period that the Transfer Portal is open, which this year is between December 9, 2024, and December 28, 2024. (*Id*. at ¶ 4; Doc. No. 34-10). During the Transfer Portal window, teams fill roster spots available to transfer athletes for the coming year. Vanderbilt Coach Clark Lea explained that he "would love to have [Pavia] back next year," but that he expects that Vanderbilt will "lock in" the quarterbacks for 2025 and "it will become very difficult" to bring Pavia back after that time. (Lea Decl., Doc. No. 9-2). Pavia states that his ability to play next year also impacts his ability to negotiate NIL deals for the coming season with Anchor Impact, the NIL collective of Vanderbilt athletics, and others, many of whom will allocate their NIL budget during this period. (*See* Pavia Decl., Doc. No. 9-1; Grindstaff Decl., Doc. No. 9-3).

---

[6]     Pavia played football at New Mexico Military Academy for two seasons, but one of those seasons was in 2020 during the COVID pandemic. The NCAA issued a blanket waiver permitting institutions to self-apply a season of competition and a one-year eligibility waiver. (Vaughn Decl., Doc. No. 30-1 at ¶ 21-23). In effect, the 2020 season did not count towards the four seasons of competition limit or five years of eligibility. *Id*. Accordingly, only one of Pavia's two years at New Mexico Military Academy "counts."

7

## II.    ANALYSIS

Pavia seeks a preliminary injunction precluding the NCAA from enforcing the Intercollegiate Competition Rules and prohibiting him from playing football in 2025 by counting his 2021 season of junior college football as a year of intercollegiate competition. He contends such enforcement is an undue restraint on the labor market for college football players that violates the Sherman Act.

### A.  Standard of Review

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Enchant Christmas Light Maze & Market Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (emphasis in original) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also*, *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."). The movant "faces a burden of proof 'more stringent than the proof required to survive a summary judgment motion.'" *Enchant*, 958 F.3d at 539 (quoting *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)).

In determining whether to issue a preliminary injunction under Federal Rule of Civil Procedure 65, the Court considers: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff is likely to suffer irreparable harm absent the injunction; (3) the balance of equities; and (4) the impact of the injunction on the public interest. *See, e.g., Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017). While these factors are a balancing test, "even the strongest showing on the other three factors cannot eliminate the irreparable harm requirement." *D.T. v. Sumner Cty. Sch.,* 942 F.3d 324, 326-27 (6th Cir. 2019) (internal quotations omitted).

Likewise, a failure to establish a likelihood of success on the merits "'is usually fatal' to a plaintiff's request for preliminary injunction." *Enchant*, 958 F.3d at 539 (quoting *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000)).

## B.    Likelihood of Success on the Merits

"In order to establish a likelihood of success on the merits of a claim, a plaintiff must show more than a mere possibility of success." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citation omitted). Here, Pavia alleges that the NCAA's Intercollegiate Competition Rule violates Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. To succeed under Section 1 of the Sherman Act, Plaintiff must show that the NCAA "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 718 (6th Cir. 2003).

The parties do not dispute that NCAA member institutions "participate in an agreement" regarding the challenged rules. Instead, they focus on whether the challenged rules unreasonably restrain trade in the relevant market, which they seem to agree is the labor market for college football. Before reaching that issue, however, the Court must first address the NCAA's argument that the Sherman Act does not apply because the rules at issue are not commercial in nature.

The Sixth Circuit has held that Section 1, "[b]y its plain language" applies "only if the rule is commercial in nature." *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, 388 F.3d 955, 958 (6th Cir. 2004). "[T]he appropriate inquiry is 'whether the rule itself is commercial, not whether the entity promulgating the rule is commercial.'" *Bassett v. Nat'l*

9

*Collegiate Athletic Ass'n*, 528 F.3d 426, 433 (6th Cir. 2008) (quoting *Worldwide Basketball*, 388 F.3d at 959). "[T]he analysis must focus on the [challenged rule] itself and not NCAA as a commercial entity." *Id*. NCAA argues courts have consistently refused to enjoin or invalidate NCAA eligibility requirements holding those rules are non-commercial in nature. (Def. Resp., Doc. No. 30 at 17-18 (citing *Bassett*, 528 F.3d at 433; and *Gaines v. Nat'l Collegiate Athletic Ass'n*, 746 F. Supp. 738, 744 (M.D. Tenn. 1990)).

 *Bassett* concerned a coach's challenge to enforcement of an NCAA rule prohibiting improper recruiting inducements and academic fraud. *Bassett*, 528 F.3d at 429. *Gaines* involved a challenge to the NCAA's "No Draft Rule" under which players who enter the NFL draft lose their amateur status and are thus ineligible to compete in the NCAA if they are not selected by a team in the draft. *Gaines*, 746 F. Supp. at 740. Both the *Bassett* and *Gaines* courts held that the challenged rules were noncommercial and thus not subject to antitrust analysis. *See Bassett*, 528 F.3d at 429 (holding the challenged rules on recruiting student-athletes and academic fraud "are all explicitly non-commercial"); *Gaines*, 746 F. Supp. at 744 (finding the eligibility rules had primarily noncommercial objectives). It is apparent, however, that those decisions were grounded in a pre-NIL world. In fact, both *Bassett* and *Gaines* reasoned that the rules were not commercial in nature because they were designed to keep commercial interests out of college sports. The *Bassett* court stated that, "[i]n fact, those rules are *anti-commercial*" and that it would "violate the spirit of amateur athletics [to] provid[e] remuneration to athletes in exchange for their commitments to play for the violator's football program." 528 F.3d at 433 (emphasis in original). *Gaines* also emphasized that the "overriding purpose of the eligibility Rules [] is – to prevent commercializing influences from destroying the unique 'product' of NCAA college football." 746 F. Supp. at 744.

The NCAA argues that the Intercollegiate Competition Rules challenged here are, like the eligibility rules challenged in *Bassett* and *Gaines*, non-commercial in nature. Plaintiff responds that in the post-*Alston* world in which student-athletes can obtain NIL compensation, *Bassett*, *Gaines*, and other pre-*Alston* cases cited by the NCAA simply do not apply. Instead, Plaintiff asserts that when the NCAA lifted the restriction on NIL compensation, rules regulating who can play – *i.e.*, who can enter the labor market for NCAA Division I football – became "commercial in nature." The Court agrees. As the *Tennessee* court explained, "[a]greements between NIL collectives and student-athletes are undoubtedly commercial transactions. It necessarily follows that NCAA rules restricting negotiations of those agreements are also explicitly commercial in nature." *Tennessee*, 718 F. Supp. 3d at 762. And it necessarily follows that restrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature. *See also*, *Ohio*, 706 F. Supp. 3d at 591 (restrictions on a student-athlete's ability to play are a restraint on trade and subject to the Sherman Act); *Brantmeier v. Nat'l Collegiate Athletic Ass'n*, No. 1:24-cv-238, 2024 WL 4433307, at *2 (M.D.N.C. Oct. 7, 2024) (finding the NCAA's argument that rules prohibiting student-athletes from accepting prize money are non-commercial eligibility requirements that are not subject to the Sherman Act was "unlikely to be successful").

The NCAA argues this logic "could ultimately lead to stripping college athletics of its defining feature – that it is played by student-athletes." (Def. Resp., Doc. No. 30 at 20-21). Not so. It merely means that the NCAA's eligibility rules are subject to the Sherman Act. As will be discussed further below, this does not mean that the NCAA cannot impose eligibility rules, only that those rules will be subject to further scrutiny to determine whether they are an undue restraint on trade. As the Supreme Court stated in *Alston*, "The 'statutory policy' of the Act is one of competition and it 'precludes inquiry into the question whether competition is good or bad.'

*Alston*, 594 U.S. at 95. The *Alston* court continued, "[The Sherman Act] is predicated on one assumption alone – 'competition is the best method of allocating resources' in the Nation's economy." *Id.* at 96 (citing *Nat'l Soc. of Prof. Engr's v. United States*, 435 U.S. 679, 695 (1978)).

Having found the Intercollegiate Competition Rules are subject to the Sherman Act, the Court turns to Plaintiff's claim that these Rules unreasonably restrain trade in the labor market for college football, specifically NCAA Division I football. The Supreme Court explained the applicable standard:

> [The Supreme Court] has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'" *Ohio v. American Express Co.,* [585 U. S. 529, 540 (2018)], (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." *Texaco Inc. v. Dagher*, [547 U.S. 1, 5 (2006)]; *Standard Oil Co. of N. J. v. United States*, [221 U.S. 1, 60–62 (1911)]. That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." *American Express*, [585 U. S. at 541] (internal quotation marks omitted). Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Ibid.* (brackets and internal quotation marks omitted).

*Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69, 81 (2021).

The Supreme Court described the rule of reason analysis as follows:

> When describing the rule of reason, this Court has sometimes spoken of "a three-step, burden-shifting framework" as a means for "'distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest.'" *American Express Co*., [585 U. S. at 541]. As we have described it, "the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect." *Ibid*. Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint." *Ibid*. If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the

12

procompetitive efficiencies could be reasonably achieved through less anticompetitive means." [*Id*. at 542].

> These three steps do not represent a rote checklist, nor may they be employed as an inflexible substitute for careful analysis. As we have seen, what is required to assess whether a challenged restraint harms competition can vary depending on the circumstances. …The whole point of the rule of reason is to furnish "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint" to ensure that it unduly harms competition before a court declares it unlawful.

*Id*. at 97 (internal citations omitted).

The amount of work needed to conduct the rule of reason analysis varies. *Id*. at 88. Restraints at opposite ends of the spectrum may be approved or condemned in the "twinkling of an eye" with a "quick look." *Id*. (citing *Nat'l Collegiate Athletic Ass'n v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 110 n.39 (1984)). However, the Court must take care not to quickly condemn particular agreements among competitors unless it has confidence that the arrangement at issue "would be invalidated in all or almost all instances." *Id*. at 89 (citing *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007); Frank H. Easterbook, *On Identifying Exclusionary Conduct*, 61 Notre Dame L. Rev. 972, 975 (1986)).

### 1. Substantial Anticompetitive Effect

Plaintiffs can demonstrate a substantial anticompetitive effect directly or indirectly. *American Express,* 585 U.S. at 542. Direct evidence of anticompetitive effect is "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant market." *Id*. (citations omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id*. (citations omitted). Plaintiff focuses primarily on indirect evidence.[7]

---

[7] Pavia cited direct and indirect evidence of anticompetitive harm. (*See* Pl. Reply, Doc. No. 33 at 3-5). At the hearing, however, counsel for Pavia stated that Plaintiff was focused on indirect evidence. (Hearing Trans., Doc. No. 38 at 27).

13

Plaintiff asserts the relevant market is the labor market for college football athletes in general and NCAA Division I football specifically. (*See* Pl. Mem., Doc. No. 22 at 15). Although the NCAA argues Pavia has not offered evidence to support the proposed market definition, it does not dispute that the proposed market is the relevant market for purposes of the Court's antitrust analysis. (*See* Def. Resp., Doc. No. 30 at 22). Moreover, other courts considering antitrust challenges to NCAA eligibility rules have found that the labor market for college athletes, in this case college football, to be relevant labor markets. *See e.g.*, *Alston*, 594 U.S. at 90 ("market for student athlete services"); *Tennessee*, 718 F. Supp. 3d at 761-62 ("market for Division I athletics"); *Ohio*, 706 F. Supp. 3d at 592, Ex. A (finding that "the labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets").

The eligibility regulations imposed by the NCAA and its member organizations generally constitute horizontal agreements.[8] *See Business Elec. Corp. v. Sharp. Elec. Corp*., 485 U.S. 717, 730 (1988) (explaining that horizontal agreements are agreements between competitors at the same level in a particular industry). There is no question that the NCAA and its members hold monopsony power over the labor market for college football and, therefore, have "market power." (Maxcy Decl., Doc. No. 33-1 at ¶¶ 23-24; *see also*, *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("[The] NCAA acknowledges that it controls the market for college athletics" and "accepts that its members collectively enjoy monopsony power in the market for [college athlete services[.]").

---

[8]     The Supreme Court has stated that the definition of the market need not be precise when the challenged restrictions are a horizontal restraint on trade. *See American Express*, 585 U.S. at 543, n.7.

14

At issue is whether Plaintiff has presented some evidence that the challenged eligibility rules harm competition. Plaintiff has met this threshold. Plaintiff contends the challenged rules restrict competition in the labor market for Division I college football players in several ways.

First, the challenged rules limit the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. This Rule gives a competitive advantage to NCAA Division I member schools over junior colleges – and thus the football players at each level – even though they are treated the same in terms of eligibility. (Maxcy Decl., Doc. No. 33-1 at ¶ 27).

The disparate treatment of these two groups also results in a distortion of the labor market for NCAA Division I football players by pushing student-athletes to attend NCAA member institutions so that they may enjoy a full four seasons of NCAA Division I eligibility even if junior college might otherwise be a better choice academically or athletically. (*Id*.). Similarly, students who attend junior college for one year and are considering whether to continue their junior college education and obtain an associate degree or transfer to a NCAA Division I institution may be swayed in their decision by the prospect of relinquishing another year of NCAA eligibility and the accompanying competitive advantages and NIL compensation. The rule requiring forfeit of NCAA eligibility and associated NIL opportunities for junior college attendance discounts that choice. (*Id*.).

NCAA Division I member institutions compete directly with NJCAA schools for football talent. (*Id*. at ¶ 26). NCAA Division I offers a prospective football player significant advantages over junior college football – more exposure, potentially better competition and coaching, and

financial advantages due to the NIL opportunities disproportionately offered to Division I athletes. (*Id*. at ¶ 27).

In summary, the eligibility bylaws induce potential football players to attend NCAA institutions rather than non-NCAA institutions even when non-NCAA institutions, such as junior colleges, might be in their best interest. Therefore, the rule harms student athletes when they are making decisions on whether to attend a junior college or an NCAA institution.

The effects on the labor market also cause downstream effects for consumers of collegiate athletics because the restriction on the eligibility of former junior college student-athletes to compete at the Division I level harms the competitiveness of the teams by limiting the number of years these players can compete at the Division I level.

This is similar to the anticompetitive effects of the Transfer Eligibility Rule found by the court in *Ohio v. National Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583, 594 (N.D.W.V. 2023). There, the court found the NCAA Rule barring students from competition until they fulfilled an academic year of residence reduced competition among NCAA schools for transfer athletes, resulting in harm to the Division I student-athletes who were directly affected by the rule and to consumers of college athletics because the value of the college athletics product and the competitiveness of teams was diminished by the absence of skilled transfer players. *Id*.

The NCAA characterizes Pavia's argument of anticompetitive harm as strictly personal to himself rather than the market, and contends that the effect of the challenged rules is economically neutral because regulations concerning when and for how long a student-athlete can compete merely shift the benefits from one set of athletes (those ineligible) to another set (those who are eligible), resulting in no change to market quality or output. (Backus Decl., Doc. No. 30-2 at ¶¶

16

25-27). The NCAA further argues that Pavia does not contend the eligibility restrictions benefit the NCAA or its member schools at the expense of student-athletes. (*Id*. at ¶ 27).

These arguments do not address the competitive harm in the market for NCAA Division I college football players that gives NCAA member schools an advantage in recruiting student-athletes by restricting their NCAA eligibility if they enroll in a non-NCAA member school. And the NCAA's assertion that restrictions on the length of eligibility have a net neutral affect ignores the new economic reality in the age of NIL compensation. Even if it is true that the challenged rules do not affect the total number of athletes competing in Division I football in a given year, restrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects. The NCAA's real argument is that these restrictions are necessary to allow the NCAA to offer the differentiated product of collegiate football. But that argument is for the next step in the analysis.

Based on the foregoing, the Court finds Plaintiff has shown a likelihood that that the challenged restraints have a substantial anticompetitive effect in the labor market for college football. Accordingly, the burden then shifts to the NCAA to show a procompetitive justification for the challenged rules.

    2.  <u>Procompetitive Rationale</u>

The NCAA states that the procompetitive benefits of the Intercollegiate Competition Rules are: "1) preserving intercollegiate athletics as a unique offering to many prospective and current student-athletes, expanding output; and 2) enhancing the experiences of student-athletes, improving the quality of output." By this, the NCAA explains that it contends the challenged rules: (1) preserve intercollegiate athletics as a unique offering; (2) increase the number of students

who compete in Division I football; (3) improve the quality of the student-athlete experience; and (4) foster better alignment between athletics and academics.

The NCAA contends the eligibility rules restricting participation in Division I athletics are necessary to preserve the character of NCAA Division I football as a differentiated athletic product. (Backus Decl., Doc. No. 30-2 at ¶ 51). The NCAA claims that "absent the challenged rules, it could become the norm for many student-athletes to spend time developing their skills on [junior college] football teams before competing for Division I schools, thus diminishing their options upon high school graduation, distorting their college careers, delaying their professional careers, and changing the character of NCAA Division I Football as a differentiated athletic product." (*Id.*).

Next, Defendant argues the challenged rules increase the total number of student-athletes relative to Plaintiff's proposed Rule change (expanding output) and improve the student athlete experience (quality of output). Defendant explains that because Division I football opportunities are finite, if some students continue to play longer than the Rules currently allow, the total number of student-athletes will decrease, and the challenged rules create opportunities for younger athletes who want to attend a four-year college and compete immediately after high school graduation. The NCAA argues that without these eligibility rules student-athletes who have attended and competed at a junior college or other non-NCAA college would have an advantage in being selected for Division I teams and "crowd out" younger, less experienced student-athletes.

Finally, the NCAA argues that extending eligibility would also extend the academic careers of those student athletes thereby defeating the "natural and standard degree progression timeline that is central to the NCAA's mission." (*Id.* at ¶ 56; *see also*, Vaughn Decl., Doc. No. 30-1 at ¶¶ 20 (stating that the Bylaws are designed to align the student-athletes' period of athletic competition

with their anticipated academic achievement and progress towards a college degree)). The NCAA argues the eligibility rules, including the limited timeframe, are necessary to "preserve a space for collegiate competition," and contends the rules "cohesively meld[] NCAA member schools' academic and athletic objectives." (Def. Resp., Doc. No. 30 at 31).

The Court is not persuaded that restricting the NCAA Division I eligibility of former junior college athletes to three or four years is relevant to the "differentiated athletic product" of Division I football. The NCAA eligibility rules allow other forms of post-secondary education and athletic competition without it "counting" against eligibility. For example, the NCAA does not start the eligibility clock for prep school student-athletes even though those students can earn credit toward a degree and may compete athletically against junior colleges and other schools that qualify as "collegiate institutions."[9] And there are a number of reasons eligible student-athletes may be older and stronger than those on the traditional trajectory – military service, religious obligations, professional careers in other sports, or even independent athletic or academic work. (*See e.g.*, NCAA Bylaw 12.8.1.2). Given the different treatment of other student-athletes with comparable or more post-secondary experience, the NCAA's assertion that the eligibility rules are necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes falls flat.

---

[9]     During the December 3 hearing, the Court asked counsel for the NCAA to address an example concerning prep schools. (*See* Hearing Trans., Doc. No. 38 at 71-77). The United States Air Force Academy Preparatory School recently competed in a regular season football game against Snow College, a junior college in Utah. The players in that game are viewed differently by the NCAA. The prep school players' eligibility is not impacted by playing that season of football, while the junior college players' participation in that season costs them a year of Division I eligibility under the challenged rules should those players ultimately play at that level. The NCAA's response, in effect, was that it chooses to define "collegiate institution" to include junior colleges but not the prep schools the junior colleges may compete against. This illustration further illustrates the illogic of the NCAA's rule concerning eligibility afforded to former junior college players.

So too does the NCAA's argument that the challenged rules prevent more experienced athletes from "crowding out" younger, less experienced athletes. Division I programs use the transfer portal to fill roster spots for the next season. (Lea Decl., Doc. No. 9-2; *see also*, Grindstaff Decl., Doc. No. 9-3). Those transfers – which are allowed by the NCAA – take a spot that might otherwise go to an incoming freshman player. Accordingly, the NCAA's own rule can have the same effect – a school opting for a more experienced player.

Lastly, the NCAA's goal of maintaining a "natural and standard degree progression" also appears pretextual, particularly considering that the NCAA's Rules concerning the duration of eligibility have evolved over time, which suggests that strict adherence to the eligibility timeframe, including the restrictions applicable to junior college student-athletes, does not have procompetitive benefits. For example, when freshmen were not allowed to play varsity football, student-athletes had only three seasons of varsity eligibility. Then, the freshman play rule was eliminated and the limit on eligibility was later increased to four seasons within five calendar years. The Rules were amended again to allow NCAA Division I football players (but not other Division I athletes) another half season (or potentially more) of play through the Redshirt Rule (NCAA Bylaw 12.8.3.1.6), which allows football players to play up to four games per season without losing a year of eligibility. Then, in August of this year, the NCAA again expanded the amount of playing time when it passed Bylaw 17.11.6.2.1, which excluded all post-season competition from the Redshirt Rule. This resulted in an increase in the number of games that can be played in an exempt season from four games to a potential of nine games.[10] Even now, the NCAA is discussing

---

[10]     *See* Compl., Doc. No. 1 at ¶ 39 n.17 (citing CBSSports.com, "NCAA rules postseason contests no longer count against four-game max for redshirt eligibility," *https://www.cbssports.com/college-football/news/ncaa-rules-postseason-contests-no-longer-count-against-four-game-max-for-redshirt-eligibility/* (last visited Nov. 7, 2024)). Counsel for the NCAA confirmed this rule change during the December 3 hearing. (Hearing Trans., Doc. No. 38 at 107-08).

potential changes to the four seasons of competition and five-year rule.[11] (*See* Notice, Doc. No. 39).

Moreover, the NCAA has recently made changes to its rules that do not appear to support the stated goal of maintaining "natural and standard degree progression." Recently, the NCAA changed its rules to allow student-athletes unlimited transfers between schools. The Court finds it highly implausible that frequent transfers, even those within NCAA institutions, benefit an athlete's academic career and promote "natural and standard degree progression." As Plaintiff points out, institutions are not guaranteed to accept transfer credits from another institution whether it be another NCAA institution or a junior college. The NCAA's reliance on the goal of maintaining "standard degree progression" when it is convenient and eschewing it when it is not leads the Court to conclude that the stated goal is a mere pretext to justify applying the eligibility timeframe to junior college athletes even when it is clear that junior college does not provide an academic or athletic experience equivalent to that of Division I institutions.

Even if the NCAA's justifications were valid and not pretextual, these goals can be accomplished through the less restrictive alternative proposed by Plaintiff.

3. <u>Less Restrictive Alternatives</u>

Pavia proposes the less restrictive alternative of changing the start of the eligibility clock in NCAA Bylaw 12.8.1 and 12.8.1.1 to be triggered based on when an athlete first registers for classes at "an NCAA member institution" instead of when they register at a "collegiate institution" as in the current bylaws. Likewise, the definition of "intercollegiate competition" in NCAA Bylaw

---

[11]     *See* Compl., Doc. No. 1 at ¶ 43 (citing *https://theyellowjacket.org/the-ncaa-begins-discussions-to-give-all-student-athletes-the-chance-for-a-fifth-year-option/* (last visited Nov. 7, 2024)). After this issue was raised during the preliminary injunction hearing, the NCAA filed a Notice confirming that "the Division I membership has begun discussing potential changes to the four seasons of competition and five-year rule." (NCAA Notice, Doc. No. 39 at 4).

12.02.6 could be changed to reference when an athlete is "in a NCAA member institution" as opposed to "in either a two-year or a four-year collegiate institution" as in the current bylaws. Finally, Pavia proposes that the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from NCAA Bylaw 14.3.3 should be deleted.

Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA. For example, the proposed rules maintain restrictions on the duration of eligibility, thereby preserving the character of NCAA Division I sports as one played by student-athletes and ensuring that the student-athletes cannot remain in that status indefinitely. The proposal also maintains the linkage to the natural degree progression within the four-year institution and does not affect other eligibility rules such as amateurism and academic progression.

The NCAA argues that further economic analysis is necessary to determine whether the challenged Rules have anticompetitive effects. While such analysis will undoubtedly provide further information, the Court is comfortable on the record at this juncture concluding in the "twinkling of an eye" that the Intercollegiate Competition Rules are restraints on trade with substantial anticompetitive effects for the purpose of the instant motion. Accordingly, Pavia has a strong likelihood of success on the merits of his Sherman Act claim.

## C.     Irreparable Harm

This Court has no trouble concluding, as many other courts have, that the denial of the ability to play sports is irreparable harm. *See Ohio*, 706 F. Supp. 3d at 597 ("Courts have repeatedly found that '[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports.'") (collecting cases). In addition, although the value of missed NIL opportunities could potentially be quantified, the lost opportunity to play NCAA Division I football for four seasons results in loss opportunity for exposure and building his "personal brand."

The NCAA argues Pavia's delay in seeking injunctive relief weighs against a finding of irreparable harm. (Def. Resp., Doc. No. 30 at 13 (citing *Huron Mtn. Club v. U.S. Army Corps of Eng'rs*, 545 F. App'x 390, 397 (6th Cir. 2013)). The NCAA also asserts that, while Pavia has tied his allegations of irreparable harm to the transfer portal window, the constraints of the window are not absolute – Pavia himself transferred to Vanderbilt after the portal closed. (*Id*. at 15).

Pavia responds that it would not have been reasonable for him to challenge the eligibility rules immediately following *Alston* given the constant evolution of the NCAA Bylaws since that decision and reports that the NCAA announced that it was considering providing five seasons of eligibility to athletes over the course of five years. (*See supra* note 11). The Court agrees that, under the circumstances here where there have been recent changes both to Pavia's personal circumstances and the legal landscape, the fact that Pavia did not challenge the eligibility rules until now does not discount the irreparable harm. Finally, the parties agree that this case is not likely to be resolved on the merits before the fall 2025 season, so even if the relief sought is not tied to the transfer portal window, Pavia has shown irreparable harm will result before this case can be resolved on the merits. (*See* Hearing Trans., Doc. No. 38 at 113-15).

**D. Balance of Equities & Public Interest**

The balance of equities and the public interest also weigh in favor of granting the injunction. The scope of injunctive relief sought is narrow – to preclude the NCAA from enforcing Bylaw 12.02.6 *as to Pavia* – to allow him to play next season while this case plays out. The NCAA's argument that injunctive relief in this case would be a sweeping change that will "upend the Division I eligibility rules that apply across sports to over 180,000 Division I student-athletes" is overstated. (*See* Def. Resp., Doc. No. 30 at 35). Enjoining the NCAA from enforcing the Intercollegiate Competition Rule as to Pavia for next season will not result in substantial harm to others or to the NCAA. Accordingly, the balance of equities favors granting preliminary injunctive relief. Finally, the public interest is served by promoting free and fair competition in the labor markets.

**E. Security**

The Court may issue a preliminary injunction only if the movant gives security in the amount the Court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. *See* Fed. R. Civ. P. 65(c). At the hearing, Plaintiff suggested the security be waived or be set at a nominal amount. (Hearing Trans., Doc. No. 38 at 43). Defendant did not discuss the matter of security in its briefing or at the hearing. The Court finds Defendant faces no financial burden from the preliminary injunction. Accordingly, the security is waived.

### III. CONCLUSION

For the reasons stated, Plaintiff's motion for a Preliminary Injunction (Doc. No. 8) will be

**GRANTED**. For this ruling to be effective, the Court also finds it necessary to enjoin the NCAA

from enforcing Bylaw 12.11.4.2, commonly known as the Rule of Restitution, against Pavia,

Vanderbilt University, and any Division I institution for which Pavia chooses to play in 2025.[12]

An appropriate Order will enter.


_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[12] NCAA Division I Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides for potential retroactive punishments in the event an otherwise ineligible student-athlete is permitted to compete in accordance with the terms of a restraining order or injunction that is later voluntarily vacated, stayed, reversed, or if it is finally determined by the court that injunctive relief was not justified.