**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**AT NASHVILLE**

| | | |
|---|---|---|
| **DIEGO PAVIA, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-01336** |
| | ) | |
| **NATIONAL COLLEGIATE ATHLETIC** | ) | **CHIEF JUDGE CAMPBELL** |
| **ASSOCIATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

‘Twas the night before Christmas
And all through the NCAA clearinghouse
Not a creature was stirring
Not even a mouse

The stockings were hung by the chimney with care
In hopes that new eligibility soon would be there.
Clients were nestled all snug in their beds
While visions of touchdowns danced in their heads.
Judges in their robes and me in my cap
Were all settled down for a long winter's nap

When out on the internet there arose such a clatter
I sprang from my desk to see what was the matter
Away to my phone I flew like a flash
Tore open my email and noticed the cash

When what to my wandering eyes should appear,
but…

1

**…the hypocrisy of the NCAA granting four years of eligibility to a 21-year-old European professional basketball player with four years of professional experience who was drafted by an NBA team two years ago.[1] He will be 25 before he runs out of eligibility. Meanwhile, the NCAA argues to this Court that high school seniors are harmed if a 22- or 23-year-old former junior college player plays one more year of college football.**

Against that backdrop, Plaintiffs Diego Pavia, Christopher Bellamy, Demarcus Griffin, TJ Smith, Trevonte "Tre" Richardson, Trent Hudson, Andrew Burnette, James Djonkam, Iman Oates, Jose "Joey" Aguilar, Azariah "Bear" Levells, Jacob De Jesus, David Murphy, Ja'ir Smith, Anthony Frias II, Amani Givens, Zelmar Vedder, Alexander Jones, Eddy Toussom, Kyri Shoels, Jamarien Wheeler, Emery Floyd, Jayden Dixon-Veal, Nadame Tucker, Quintrayvion Taylor, Josea Wheeler, and Jaden Mosley seek immediate injunctive relief to preclude the National Collegiate Athletic Association ("NCAA") from enforcing its Intercollegiate Competition Rules (as defined below) to preclude Plaintiffs from playing NCAA Division I college football in 2026-27 and/or 2027-28 year on the grounds that such enforcement violates Section 1 of the Sherman Antitrust Act.

## FACTUAL AND LEGAL BACKGROUND

### I. The NCAA Is Governed By Self-Created Bylaws That Discriminate Against Junior College Athletes.

#### A. The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8

1.      Under NCAA Bylaw 12.8, an athlete has five years of eligibility to play four seasons of "intercollegiate competition" in his or her chosen sport (the "Five-Year Rule").  The athlete's five-year window is known as an "Eligibility Clock" and starts to run from the date on which an athlete registers as a full-time student at any "collegiate institution," whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the

---

[1] *See* USA Today, *NBA draft pick James Nnaji to join Baylor mid-season*, Dec. 24, 2025, James Nnaji, a 2023 NBA draft pick, commits to Baylor, will play this season (last accessed Dec. 26, 2025).

non-NCAA institution.  Complaint Ex. 6, at p. 66, NCAA Bylaw 12.8.1

2.       The NCAA's Guide for Two Year Transfers includes a section on the Eligibility Clock explaining that the purpose of the five-year rule is to "move student-athletes toward graduation in a timely manner."  Ex. 5, NCAA Guide for Two Year Transfers 2024-25 at p. 21.  In other words, the NCAA concedes that the Five-Year Rule is not designed for any pro-competitive purpose.

3.       The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent given that the five-year clock begins to run whether a student plays a sport or not.  Under the Bylaw, a student can attend a junior college for two years without playing any sports, obtain an associates degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of football—and earn compensation for use of their name, image, and/or likeness ("NIL").

4.       In contrast, a student who graduates from high school, plays football at a prep school for a post-grad year, and then attends an NCAA school still receives five years of eligibility to play four seasons.  Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport.  The NCAA rules do not limit the ability of the former professional athlete to profit from NIL while playing Division I football, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman.  For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age.[2]  And, as of Christmas Eve, former professional athletes can even compete in the NCAA in the same sport they played professionally: "Nnaji is 21 years old and will have 4 years of eligibility, as he has never played NCAA basketball," even though he played professionally in Europe and played in the NBA Summer

---

[2] *See* https://en.wikipedia.org/wiki/Chris_Weinke (last accessed on Nov. 6, 2024).

League.[3]  Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance else it would preclude other older athletes from competing in Division 1 NCAA sports.

**B.  The "Intercollegiate Competition Rule": NCAA Bylaw 12.02.6**

5.  The NCAA defines "intercollegiate competition" as "occur[ring] when a student-athlete in either a **two-year** or a four-year collegiate institution does any of the following: ... (a) Represents the institution in any contest against outside competition." Ex. 6 at p. 46, NCAA Bylaw 12.02.6 (emphasis added).  In other words, while junior colleges are not part of the NCAA monopoly and JUCO athletes have no meaningful opportunity to earn NIL compensation, the NCAA still subtracts one season of NCAA Division I eligibility from an athlete for each year he/she competes at a junior college.

**C.  The "Three Year Transfer Limitation": NCAA Bylaw 14.3.3**

6.  In addition to the Five-Year Rule and the Intercollegiate Competition Rule, the NCAA also limits all junior college attendees to a maximum of three years of NCAA Division 1 competition – regardless of whether they compete in a junior college sport: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Complaint Ex. 6 at p. 161, NCAA Bylaw 14.3.3.  There is no pro-competitive justification for this rule that takes away one year of Division I football competition (with corresponding NIL Compensation opportunities) from students who choose to attend junior college before transferring to an NCAA school, as compared with athletes who enroll directly in a school that is a member of the NCAA monopoly.  *See Ohio v. Nat'l Collegiate Athletic Assoc.*, 706 F. Supp. 3d 583, 596 [hereinafter *State of Ohio*] ("Preventing student athletes from competing in NCAA athletic events solely because they made a decision in their own best interest and transferred schools has no

---

[3] USA Today, *NBA draft pick James Nnaji to join Baylor mid-season*, Dec. 24, 2025, James Nnaji, a 2023 NBA draft pick, commits to Baylor, will play this season (last accessed Dec. 26, 2025).

relationship with the amateur status of those athletes.").

## II. The First *Pavia* Injunction

7. This Court has already addressed many of the issues predominating this case in its ruling in granting its first preliminary injunction in this case, wherein this Court determined that NCAA Bylaws 12.8, 12.02.6, and 12.02.4 (collectively, the "Intercollegiate Competition Rules") were commercial in nature and, accordingly, subject to the Sherman Act. *See* Ex. 1, *Pavia v. NCAA*, Case No. 3:24-cv-01336, M.D. Tn., Dec. 18, 2024 Memorandum Opinion Granting Preliminary Injunction (the "*Pavia* Ruling") at 4-5, 11. Then, the Court applied Rule of Reason analysis and concluded that Plaintiff Pavia had shown "a likelihood that the challenged restraints have a substantial anticompetitive effect in the labor market for college football." *Id.* at 17.

8. Next, the Court turned to the NCAA's supposed pro-competitive rationale for the Intercollegiate Competition Rules. The NCAA argued the Intercollegiate Competition Rules: (1) "[were] necessary to preserve the character of NCAA Division I football as a differentiated athletic product;" and (2) "increase the total number of student-athletes relative to Plaintiff's proposed Rule change (expanding output) and improve the student athlete experience (quality of output)." *Id.* at 18. Finally, "the NCAA argue[d] that extending eligibility would also extend the academic careers of those student athletes thereby defeating the natural and standard degree progression timeline that is central to the NCAA's mission." *Id.* (internal quotations omitted). The Court rejected the NCAA's purported pro-competitive rationales, noting that they "appear[ed] pretextual." *Id.* at 20.

9. Finally, the Court ruled that that "[e]ven if the NCAA's justifications were valid and not pretextual, these goals can be accomplished through the less restrictive alternative proposed by Plaintiff." *Id.* at 21. Specifically,

> "Pavia propose[d] the less restrictive alternative of changing the start of the eligibility clock in NCAA Bylaw 12.8.1 and 12.8.1.1 to be triggered based on when an athlete first registers for classes at 'an NCAA member institution' instead of when they register at a 'collegiate institution' as in the current bylaws. Likewise, the definition of "intercollegiate competition" in NCAA Bylaw 12.02.6 could be changed to reference when an athlete is "in a NCAA member institution" as

5

opposed to "in either a two-year or a four-year collegiate institution" as in the current bylaws. Finally, Pavia proposes that the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from NCAA Bylaw 14.3.3 should be deleted."

*Id.* at 21-22. This Court concluded, "Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA." *Id.* at 22. Accordingly, the Court ruled that Pavia had "a strong likelihood of success on the merits of his Sherman Act claim." *Id.*

10. The Court further ruled that "the denial of the ability to play sports is irreparable harm" and that the "balance of equities and the public interest also weigh in favor of granting the injunction." *Id.* at 23-24. As a result, the Court entered an injunction precluding the NCAA from enforcing the Intercollegiate Competition Rules "*as to Pavia.*" *Id.* at 24 (emphasis in original).

11. Following this Court's ruling, on December 23, 2024, the NCAA Board of Governors issued a blanket waiver providing an additional year of eligibility to athletes similarly situated to Pavia. According to Yahoo Sports, the waiver stated:

> "'The NCAA Division I Board of Directors granted a waiver to permit student-athletes who attended and competed at a non-NCAA school for one or more years to remain eligible and compete in 2025-26,' the NCAA memo reads, 'if those student-athletes would have otherwise used their final season of competition during the 2024-25 academic year, and meet all other eligibility requirements (e.g., progress toward degree, five-year period of eligibility).'" [4]

The NJCAA praised the NCAA ruling in a press release, stating: "the NJCAA fully supports all two-year athletes seeking to continue their academic and athletic careers at the four-year level and is supportive of this waiver being granted to all two-year college student-athletes in a similar position as Diego Pavia."[5]

12. The NCAA timely appealed the Court's ruling to the Sixth Circuit and sought

---

[4] *See* Ex. 2 – *NCAA agrees to waiver for JUCO players after Diego Pavia lawsuit injunction*, Dellenger, R., Yahoo Sports, Dec. 24, 2024, available at: https://sports.yahoo.com/ncaa-agrees-to-waiver-for-juco-players-after-diego-pavia-lawsuit-injunction-214903548.html (last visited July 2, 2025).
[5] Ex. 3, Dec. 23, 2024 NJCAA Press Release.

expedited appeal, to which Pavia agreed. The Sixth Circuit denied the appeal as moot due to the NCAA's waiver and remanded the case. On November 4, 2025, the Court consolidated another similarly situated lawsuit *Bellamy v. NCAA*, Case No. 25-00750, into this case, and additional plaintiffs joined on November 21, 2025 and December 26, 2025 through the filing of First and Second Amended Complaints (if the Court grants Plaintiffs' Motion for Leave to Amend).

13. Plaintiffs in this case are all similarly situated to Pavia in that they started their collegiate football careers at junior colleges prior to transferring to NCAA Division I schools. They seek the same relief Pavia sought (which the NCAA has, to date, denied them). Unfortunately, rather than drafting its waiver to apply until the conclusion of this lawsuit, the NCAA drafted it to last only through the end of the 2025-26 season. Plaintiffs ask the Court to maintain the status quo created when the Court issued its injunction one year ago and the NCAA issued a blanket waiver extending that injunction to all similarly situated former junior college athletes. While the present college football season is coming to a close, this case is not yet over, and the present status quo allows former junior college players to compete in NCAA Division I football without regard to years of eligibility or seasons of competition at junior colleges. Plaintiffs asks the Court to judicially extend the waiver issued by the NCAA in response to this Court's own prior ruling until the conclusion of this case.

### III.   Application of Intercollegiate Competition Rules to Plaintiffs

14. A discussion of each Plaintiff's individual circumstances is set forth in paragraphs 58 to 100 of the Second Amended Complaint, which is incorporated by reference herein rather than restating details applicable to each Plaintiff. For purposes of the Sherman Act and this Motion for Preliminary Injunction, all Plaintiffs began playing football at a junior college before transferring to an NCAA Division I institution. Each Plaintiff has played fewer than four seasons of competition in fewer than five years since enrolling in a four-year institution after junior college.

15. Applied collectively, the Intercollegiate Competition Rules violate Section 1 of the Sherman Act by restraining the market for NCAA Division I college football players by precluding Plaintiffs and other similarly situated football players who enrolled in junior colleges from having

7

an opportunity to earn NIL Compensation while playing the same four seasons of NCAA Division I college football available to non-junior college players.

16.     Despite this Court's ruling in *Pavia*, the NCAA continues to start each athlete's Eligibility Clock while the athlete is attending a non-NCAA institution and is unable to earn NIL Compensation.  The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level (where little to no NIL is available) as reasonably commensurate with the opportunity to earn NIL Compensation while playing NCAA Division I football.  The Three-Year Limitation violates the Sherman Act by taking a year of NCAA Division I football and NIL earning potential away from athletes as punishment for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA institution.

## LEGAL STANDARD

17.     Plaintiffs are entitled to injunctive relief when they have shown (1) a likelihood that they will succeed on the merits; (2) that they will suffer irreparable harm if the injunction is not granted; (3) that granting the injunction will probably not cause substantial harm to others; and (4) that the injunction advances the public interest. *Jones v. Caruso*, 569 F.3d 258, 270 (6th Cir. 2009). "These factors are not prerequisites which must be met, but are interrelated considerations that must be balanced together." *Advantage Waypoint, LLC v. Baker*, No. 3:17-CV-01053, 2018 WL 10152454, at *2 (M.D. Tenn. Jan. 23, 2018).

## ARGUMENT

18.     Balancing the four factors outlined above, the Cout should grant a temporary restraining order and a preliminary injunction against Defendant's enforcement of the Intercollegiate Competition Rules as applied to Plaintiffs.

## I.     Plaintiffs Will Likely Succeed on the Merits of Their Sherman Act Section 1 Claim.

19.     Section 1 of the Sherman Act provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.   This is a classic "refusal to deal" or "group boycott" case given the exclusion of all junior college players from Division I

football before they play four seasons of competition. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294–97 (1985). However, Rule of Reason analysis still applies under the Sherman Act because the "case involves an industry in which horizontal restraints on competition are essential if the product is to be available at all." *National Collegiate Athletic Assn. v. Board of Regents of University of Oklahoma*, 468 U.S. 85, 101 (1984).

20. Therefore, the Court should analyze Plaintiffs' claims under Section 1 of the Sherman Act using "a three-step, burden-shifting framework applies." *NCAA v. Alston*, 594 U.S. 69, 96 (2021). First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect" in the relevant market. *Id.* If a plaintiff meets this burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* If a defendant provides this rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.*

21. "[T]he amount of work needed to conduct a fair assessment of these questions can vary." *Id.* "At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny. . . . At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful per se or rejected after only a quick look." *Alston*, 594 U.S. at 89. Here, this Court has already ruled that the Intercollegiate Competition Rules are likely an inappropriate horizontal price fixing restraint on trade in that they decrease years of competition (and NIL Compensation) available to certain athletes simply because they chose to attend a junior college prior to an NCAA Division I school. In addition to the *Pavia* Ruling, Plaintiffs rely on multiple declarations filed by Prof. Joel Maxcy (Exs. 13, 14, and 16) and live testimony presented by Prof. Maxcy in Court during the *Elad* case where he was subject to cross examination by the NCAA (Ex. 15), a Declaration from the National Junior College Athletic Association, and public available documents. A more detailed analysis follows:

### A. The Intercollegiate Competition Rules Are Commercial in Nature

22. Contrary to the NCAA's argument, NCAA eligibility rules governing football (and

men's basketball) players *are* commercial in nature during the present the NIL era and any argument that NCAA "eligibility rules [] do not regulate any commercial activity" is simply "not credible." *See Elad v. NCAA*, ___ F.4th __, 2025 WL 3278106 (3rd Cir. Nov. 25, 2025) ("The District Court did not err in holding that the JUCO Rule is commercial because it interferes with Elad's desire to compete in NCAA Division I athletics and profit from that participation. Stated differently, Elad alleges that the JUCO Rule limits his participation in a labor market. And the Supreme Court has long recognized that restraints on labor through association rulemaking that unduly interfere with the free exercise of the rights by those engaged, or who wish to engage, in trade and commerce are subject to the Sherman Act.") (internal quotations omitted); *O'Bannon*, 802 at 1064–65; *Pavia v. NCAA*, 154 F.4th 407, 421 (6th Cir. Oct 1, 2024), J. Hermandorfer, concurring ("But as I currently understand things, that's not because the NCAA can immunize any trade restraint from review by deeming it "eligibility" related. Otherwise, the price-fixing in *Alston* could pass unscrutinized if recast as a rule rendering ineligible any player receiving excessive benefits. "); Ex. 1, *Pavia* Ruling at p. 11 ("[R]estrictions on who is eligible to play and therefore to negotiate NIL agreements is also commercial in nature.").

23. The NCAA also gains a financial advantage from the eligibility rules. As explained by Professor Maxcy: "There is doubtless a financial advantage [to NCAA member schools] in moving older players out and replacing them with younger players" because "an outgoing star would be considerably more costly to the school than an incoming player."[6] That conclusion is supported by Plaintiffs' Declarations (Ex. 17) demonstrating that they each earned more money with each successive year of NCAA Division I competition.

**B.     The United States Labor Market for NCAA Division I Football Players is the Relevant Labor Market**

24. "A relevant product market 'is composed of products that have reasonable interchangeability for the purposes for which they are produced.'" *Berlyn Inc. v. Gazette Newspapers, Inc.*, No. 02-2152, 2003 U.S. App. LEXIS 16814, *13 (4th Cir. Aug. 18, 2003)

---

[6] Ex. 16, Maxcy Decl. at ¶ 83.

(quoting *United States v. E.I. duPont de Nemours and Co.*, 351 U.S. 377, 404 (1956)). When analyzing a restriction in the context of "supplier markets such as the employment market . . . the relevant market is one where employment positions are reasonably interchangeable with those offered by defendant." *NHL Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 472 (6th Cir. 2005). "Reasonable interchangeability may be gauged by (1) the product uses, *i.e.,* whether the substitute products or services can perform the same function, and/or (2) consumer response (cross-elasticity)." *White & White, Inc. v. American Hospital Supply Corp.,* 723 F.2d 495, 500 (6th Cir. 1983).

25.     The Intercollegiate Competition Rules affect the labor market for football players, like Plaintiffs, at the NCAA Division I level.[7] *State of Ohio*, 706 F. Supp. 3d at 592 ("The NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.") The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States. Within this market, college athletes like Plaintiffs compete for roster spots on Division I football teams, and those NCAA Division I colleges compete against each other to recruit the best college athletes to compete on their athletic teams.

26.     Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. Plaintiffs submit that this market is "readily apparent" and does not require further analysis on its existence. *See NCAA v. Bd. of Regents of the*

---

[7] Because the NCAA eligibility limitation rules are horizontal restraints on trade, the definition of the market need not be precisely defined. *See AmEx*, 138 S.Ct. at 2285 n. 7.

*University of Oklahoma,* 468 U.S. 85, 109 (1984).

27. That said, the opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. The NCAA itself frequently reiterates the unique nature of its amateurism model, arguing in *Alston* that this model "widens consumer choice by providing a unique product—amateur college sports as distinct from professional sports." *Alston*, 594 U.S. at 82. The "NCAA acknowledges that it controls the market for college athletes." *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring). Further, "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for [college athlete] services, such that its restraints can (and in fact do) harm competition." *Alston*, 594 U.S. at 90. There are no alternatives to the benefits of participation in NCAA Division I football for college football players, as noted in *Alston*, college athletes "have nowhere else to sell their labor" or earn NIL Compensation. *Id.*

28. And, as a practical matter, NIL opportunities are only available college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those athletes.[8] Plaintiffs had no reasonable opportunity to earn any NIL Compensation, and earned none, when they played at junior college.

29. Finally, while the NFL represents a theoretical alternative option for football players, junior college players rarely, if ever, go directly from JUCO to the NFL without a stop at an NCAA school[9] because, amongst other reasons, a player must be three years removed from high school to enter the NFL draft.[10] Further, the NFL cannot be viewed as a competitive buyer for current Division I football players because less than 1% of Division 1 football players get

---

[8] *Id.* at footnote 17.
[9] https://jokermag.com/juco-nfl-players/ (all listed JUCO players transferred to an NCAA school before making the NFL). Last visited July 3, 2025.
[10] https://operations.nfl.com/journey-to-the-nfl/the-nfl-draft/the-rules-of-the-draft/ ("To be eligible for the draft, players must have been out of high school for at least three years and must have used up their college eligibility before the start of the next college football season."). Last visited Dec. 24, 2025.

drafted into the NFL each year.[11]  As a result, JUCO players have few, if any, potential options to continue playing football outside of the NCAA and precluding them from playing interferes with their ability to make money in their chosen profession.

30.     This case mirrors the market analysis in *Clarett v. National Football League*, 306 F. Supp. 379 (S.D. N.Y. 2004).[12]  In *Clarett*, the plaintiff challenged the NFL's draft rules, which precluded an entire group of players – those who had competed in less than three years of college – from entering the NFL through the draft.  Clarett argued the market was the "market for NFL players," which the NFL argued was insufficient.  The court disagreed:

> [T]he NFL argues that Clarett has failed to establish a prima facie claim under section 1 because he has not 'establish[ed] the contours of the relevant market.' This argument fails for two reasons, one factual and one legal. *First,* Clarett has sufficiently defined the relevant market. In his complaint, Clarett alleges that '[t]he NFL is a distinct market for professional football for which there are no reasonable substitutes in the United States.' The relevant market is therefore the market for NFL players. That the League has exclusive market power in this arena is obvious; the very fact that it can establish a Rule that excludes players from the market altogether demonstrates its market domination.
>
> *Second,* as a legal matter, the NFL's argument that Clarett has failed to define the relevant market "misapprehends the purpose in antitrust law of market definition, which is not an end unto itself but rather exists to illuminate a practice's effect on competition.' As the Tenth Circuit has explained, 'A plaintiff may establish anticompetitive effect indirectly by proving that the defendant possessed the requisite market power within a defined market or directly by showing actual anticompetitive effects....'

*Id.* at 407 (internal citations omitted).  As Clarett established a relevant market for potential NFL players, Plaintiffs have established a relevant market for potential NCAA Division I players. As noted by Judge Hermandorfer, "What arguably matters [] is how foreclosing experienced former JUCO players from their would-be third and fourth years of NCAA competition affects the Division I football labor market. And in that market, the NCAA has not disputed that it enjoys

---

[11] *See* Ex. 23, Dec. of D. Rascher (Redacted) at 11.

[12] *Clarett* was reversed by the 2nd Circuit due to the NFL's collective bargaining agreement with its Players' Association and resulting exemption from antitrust laws.  *Clarett v. National Football League*, 369 F.3d 124 (2nd Cir. 2004).  No collective bargaining exists in college football.

'monopsony[] control' and is thus 'capable of depressing wages below competitive levels and restricting the quantity of student-athlete labor.' *Pavia v. NCAA*, 154 F.4th at 420, J. Hermandorfer, concurring and citing *Alston*, 594 U.S. at 86; Blair & Harrison, *Monopsony in Law and Economics*, at 189.

### C. The Boycott of 6.3% of Football Players Prior to Their Completion of Four Seasons of Competition Constitutes Direct Evidence of a Substantial Anticompetitive Effect on the Market.

31. To establish a claim under the Rule of Reason, a plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect that harms consumers [or suppliers] in the relevant market" by either using "[d]irect evidence" of "actual detrimental effects" or "[i]ndirect evidence" of "proof of market power plus some evidence that the challenged restraint harms competition." *Ohio v. American Express Co.*, 138 S.Ct. 2274, 2284 (2018). Here, Plaintiffs have presented both direct evidence of a "substantial anticompetitive effect" from excluding Plaintiffs and all others similarly situated from the market.

32. Junior college transfer student-athletes are an important portion of Division I football rosters. In fact, as of the NCAA's July 2022 report on the "Transfer Composition of Division I Teams," 8.3% of FBS Division I football players, and 8.0% of FCS Division I football players transferred from a junior college to the NCAA.[13] The NCAA reports approximately 30,000 Division I football players in 2022, meaning that approximately 2,400 junior college players were playing NCAA Division I football in 2022.

33. There is no reason to believe the raw number of former junior college players competing in Division I football has decreased substantially since 2022 (although the NCAA has not released the data). Specifically, as of October 2025, at least 1,062 former junior college football players from the National Junior College Athletic Association ("NJCAA") were playing Division I football. *See* Ex. 16, Maxcy Decl. at ¶ 49, citing Ex. 21, Givens Decl. The NJCAA includes only 45% of all junior colleges playing football, with the California Community College

---

[13] Ex. 19, NCAA Transfer Composition of Division I Teams, July 2022.

Athletic Association Schools representing the other 55%,[14] so a reasonable extrapolation suggests that approximately 2,360 total former junior college football players played NCAA Division 1 football in 2025. As the NCAA reports, 34,939 athletes played Division I football in the 2024-25 year,[15] and approximately 6.3% of Division I football players came from junior college this season.[16] Interestingly, in seeming contradiction to its argument that the JUCO eligibility bylaws do not have a substantial impact on the market for Division 1 football players, the NCAA previously argued that the requested injunctive relief "potentially impact[s] thousands of student-athletes in the middle of the academic year." *Pavia* Response at 32.

34. Boycotting and/or refusing to deal with such a substantial part of the labor market has an economically detrimental effect on the market, as confirmed by Mr. Maxcy: "Removing those 1,000+ JUCO transfers from the supply market for college football players a year or two before their eligibility would expire under NCAA rules (excluding their time spent at JUCO) represents evidence of an 'actual detrimental effect' on the market as a whole."[17] Indeed, this lawsuit itself and the more than 35 others filed against the NCAA in the wake of the *Pavia* waiver provides substantial evidence that many junior college players desire to play an additional year of NCAA football, but have been prevented from doing so.

35. The NCAA eligibility rule's ban on competition through a restraint of trade is very similar to the NFL draft rules struck down in 1978. *See Smith v. Pro Football Inc.*, 593 F.2d 1173 (D.C. Cir. 1978). The draft "amount[ed] to a 'total ban' on competition.… It permitted college players to negotiate *with only one team. If a player could not contract with that team, he could not*

---

[14] NJCAA: 54 teams (https://njcaastats.prestosports.com/sports/fball/teams-page); California Community College Athletic Association: 66 teams (https://3c2asports.org/sports/fball/2025-26/standings?jsRendering=true).
[15] Ex. 22, NCAA Participation Report at 119.
[16] The market analysis does not change if the Court chooses to focus only on the market for FBS Division I football. According to Mr. Givens of the NJCAA, 552 former NJCAA football players were playing Division I FBS football in 2025, suggesting that approximately 1,227 total former junior college players were playing Division I FBS football. According to the NCAA participation report, there were a total of 19,497 Division I FBS football players (Ex. 22 at 93), meaning former JUCO players represented 6.3% of the market for Division I FBS football players.
[17] Ex. 16, Maxcy Decl. at 50.

*play at all.*"  *Id.* at 1187 (emphasis in original).  Similarly, taking one to two years of eligibility away from former junior college players is a total ban on competition for their services.

36.     Again, the situation mirrors *Clarett* in identifying a group boycott:

> "The Rule is harmful to competition as it provides for total exclusion of players who have not completed three college seasons or are not three years removed from high school graduation, notwithstanding their ability to perform in the market and compete for available positions in the league.  Clarett also specifically alleges that '[t]here is no other league of professional football that is comparable to the NFL.'  The market defined by Clarett is narrow—it is the market for NFL player services.  That is the only commodity that Clarett has to sell and the only commodity the NFL seeks to buy.  Accordingly, the Rule harms both Clarett and competition in the market for player services.  A purchaser's bar on an entire class of sellers harms competition in the absence of an alternative comparable buyer.

*Id.* at 401-402.  With the NFL employing less than 1% of Division I football players, there is on other "alternative comparable buyer" to Division I institutions.  Like Clarett, Plaintiffs "have been *foreclosed* from entering the market altogether. 'They are not losers in a competitive marketplace; they are not even allowed in the game.'"  *Id.* at 400 (emphasis in original).

37.     The NCAA also argues that providing an extra year of eligibility to a junior college player has no impact on the overall market because the former junior college player would simply be replaced by a younger and less experienced player.  But, as Professor Maxcy explains, this "is not a zero-sum proposition."[18]  Instead, the younger and less experienced players would not be able to make as much money in NIL as the older players who have had a chance to make a name for themselves, increasing their future NIL opportunities.  If older, more experienced players are pushed out of NCAA football, schools will have the ability to bring in additional freshmen at a much lower cost.[19]  *See Pavia* Ruling at p. 17 ("the NCAA's assertion that restrictions on the length of eligibility have a net neutral affect ignores the new economic reality in the age of NIL compensation").  Plaintiffs' own declarations demonstrating that they, almost universally, made

---

[18] *Id.* at ¶83.

[19] *Id.* ("[A]n outgoing star would be considerably more costly to the school than an incoming player. There is doubtless a financial advantage in moving older players out and replacing them with younger players. It is not a zero-sum proposition.")

more money in each consecutive subsequent year of NCAA Division I competition demonstrate that each year of experience typically adds value from an employment perspective and results in increased compensation.

38.     The NCAA argues that the *House* Settlement amounts to a salary cap whereby institutions are only allowed to share 22% of revenue with players and, as a result, schools will not save money by forcing out older, more experienced players in favor of younger, less experienced players.  However, there is no evidence to support this supposition.  First, there is no evidence that all Division I schools spend the maximum $20.5 million in 2025.  Indeed, most non-power conference schools spent a small fraction of the $20.5 million,[20] meaning that churning out older, more experienced players saves them money.  Second, schools are still able to tell associated Collectives how much to pay each athlete on top of the revenue sharing money and outside payments "arranged or facilitated by institution" "will not count against the cap" according to the College Sports Commission, the entity created by the *House* Settlement to police NIL payments to athletes.[21]  The schools and their agents decide how much to tell boosters to spend and on which players to spend it.  By replacing older, more experienced players with younger, less experienced players, institutions save money which they can direct their boosters to provide to other school-related endeavors.

**D.     There Are No Procompetitive Justifications for the Intercollegiate Competition Rules.**

39.     Because the above demonstrates the anti-competitive effect of the Intercollegiate Competition Rules on the Division I labor market for football players, the market for former JUCO

---

[20]     https://dailycollegian.com/2025/06/the-revenue-sharing-era-of-college-athletics-is-on-the-clock-how-will-umass-handle-it/ ("Don't let the number fool you: most Division I schools have nowhere near $20 million to spend. Universities in the "Power 4" conferences (Atlantic Coast, Big Ten, Big 12 and Southeastern) can hit that mark, but very few, if not all schools outside of them can't…. The University [of Massachusetts] plans to spend $5-to-6 million of the approximate $20 million cap on its athletes in 2025-26. He plans on that number rising to $8-to-10 million the following academic year." While few non-power schools have gone public with theirumbers, it's safe to assume that even $5 million puts UMass in a good spot. At the very least, it's likely one of, if not the top number in the MAC, the school's new home as of July 1.").
[21] Ex. 18, College Sports Commission Document.

players, and the consumer market for persons watching college football, the burden shifts to the

NCAA to prove a procompetitive justification for the Intercollegiate Competition Rules. Here,

this Court has already rejected the NCAA's alleged procompetitive justifications:

> The Court is not persuaded that restricting the NCAA Division I eligibility of former junior college athletes to three or four years is relevant to the "differentiated athletic product" of Division I football. The NCAA eligibility rules allow other forms of post-secondary education and athletic competition without it "counting" against eligibility. For example, the NCAA does not start the eligibility clock for prep school student-athletes even though those students can earn credit toward a degree and may compete athletically against junior colleges and other schools that qualify as "collegiate institutions."9 And there are a number of reasons eligible student-athletes may be older and stronger than those on the traditional trajectory – military service, religious obligations, professional careers in other sports, or even independent athletic or academic work. (*See e.g.*, NCAA Bylaw 12.8.1.2). Given the different treatment of other student-athletes with comparable or more post-secondary experience, the NCAA's assertion that the eligibility rules are necessary to prevent age and experience disparities and preserve the quality of experience for student-athletes falls flat.
>
> So too does the NCAA's argument that the challenged rules prevent more experienced athletes from "crowding out" younger, less experienced athletes. Division I programs use the transfer portal to fill roster spots for the next season. (Lea Decl., Doc. No. 9-2; *see also*, Grindstaff Decl., Doc. No. 9-3). Those transfers – which are allowed by the NCAA – take a spot that might otherwise go to an incoming freshman player. Accordingly, the NCAA's own rule can have the same effect – a school opting for a more experienced player.
>
> Lastly, the NCAA's goal of maintaining a "natural and standard degree progression" also appears pretextual, particularly considering that the NCAA's Rules concerning the duration of eligibility have evolved over time, which suggests that strict adherence to the eligibility timeframe, including the restrictions applicable to junior college student-athletes, does not have procompetitive benefits."

Ex. 1, *Pavia* Ruling at pp. 19-20; *See also Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring)

("the NCAA may lack such a [procompetitive] justification"). Accordingly, Plaintiffs will not

belabor this point.

> **E.     Any Potential Procompetitive Justifications for the Intercollegiate Competition Rules Could Be Accomplished by Less Restrictive Means.**

40.     Even if the academic and amateurism goals of the NCAA were valid procompetitive

justifications (and they are not), the goals could be accomplished through less restrictive

alternatives. As this Court already ruled:

> Pavia proposes the less restrictive alternative of changing the start of the eligibility clock in NCAA Bylaw 12.8.1 and 12.8.1.1 to be triggered based on when an athlete first registers for classes at "an NCAA member institution" instead of when they register at a "collegiate institution" as in the current bylaws. Likewise, the definition of "intercollegiate competition" in NCAA Bylaw 12.02.6 could be changed to reference when an athlete is "in a NCAA member institution" as opposed to "in either a two-year or a four-year collegiate institution" as in the current bylaws. Finally, Pavia proposes that the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from NCAA Bylaw 14.3.3 should be deleted. Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA.

Additionally, while Pavia proposed changing NCAA Bylaws to require attendance at an NCAA institution before the NCAA started the Five-Year Clock or began counting seasons of competition, Plaintiffs merely propose removing two-year institutions from the eligibility clock and seasons of competition while leaving in all four-year institutions. Plaintiffs have a strong likelihood of success on the merits of their Sherman Act Section 1 claim.

## II. The Potential Denial of Plaintiffs' Ability to Play Division I College Football Constitutes Immediate and Irreparable Harm Absent Injunctive Relief.

41.    "This Court has no trouble concluding, as many other courts have, that the denial of the ability to play sports is irreparable harm." Ex. 1, *Pavia* Ruling at p. 23; *S.A. v. Sioux Falls School Dist*. 49-5, 2023 WL 6794207, at ~9 (D. S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ*., 401 F.Supp.3d 834,868 (D. Mm. 2019); see also *McCormick ex rel. McCormick v. Sch. Dist. 01 Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. Of Tech., Inc.*, 2023 WL 2078264, at *16_17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate sports is irreparable harm); *Biedigerv. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist*., 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ*., 346 F.Supp.3d

19

983, 997 (E.D. Mich. 2018).

42.     Plaintiffs have not sat on their hands.  They reasonably expected the Sixth Circuit to either confirm this Court's injunction such that it would be extended for another season pending resolution of this lawsuit, or reject the injunction such that they would not receive any additional eligibility.  Instead, once the Sixth Circuit punted the issue back to this Court, they joined this lawsuit to ask the Court to extend its injunction throughout the length of this case and apply it to all Plaintiffs.

### III.     The Balance of Equities Favors Plaintiffs.

43.     As with Diego Pavia, the balance of equities also supports Plaintiffs' motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the Intercollegiate Competition Rules. In balancing the equities, the Court must ensure that issuing the injunction would not result in substantial harm to others.  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007).  Here, the NCAA faces no substantial harm from the granting of temporary and preliminary injunctive relief.  As an initial matter, requiring the NCAA to comply with federal antitrust laws cannot constitute harm.  *See Calvert Health, LLC v. Four Leaf Liquidators, LLC,* No. 3:23-CV-00110, 2024 WL 69953, at *10 (M.D. Tenn. Jan. 5, 2024) ("Defendants face no hardship as a consequence of their compelled compliance with federal law"); *GEP Admin. Servs. v. Wiseman*, 3:24-cv-00256 (M.D. Tenn. Mar. 8, 2024) ("there is generally no harm in being forced to comply with the law"). Additionally, a prohibition on enforcing the Intercollegiate Competition Rules causes no harm— economic or otherwise—to Defendant or any other entity or individual.  *See State of Ohio*, 706 F. Supp. 3d at 600 ("A prohibition on enforcing the [transfer bylaw at issue in that case] causes no harm to the NCAA or any other entity or individual. Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place.").  Indeed, no harm has come to the NCAA as a result of this Court's injunction granting Pavia an additional year of eligibility – and the NCAA's blanket waiver extending that injunction to all similarly situated athletes.

44.     The equities favor rewarding Plaintiffs for their hard work. They persevered through junior college and other non-Division 1 opportunities to work their way up to a point where Division I schools are willing to give them scholarships and pay for use of their name, image, and likeness. While, "[i]t takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation," it may take years of playing NCAA Division 1 football before achieving that one shining moment. *State of Ohio*, 706 F. Supp. 3d at 594. Because of this Court's ruling, Diego Pavia led Vanderbilt to its first 10-win season in history and became the runner-up for the Heisman Trophy. His life has been forever changed. All Plaintiffs should receive the same opportunity. Accordingly, the equities favor allowing Plaintiffs the same four years of Division I football offered to all college athletes who did not start out at a junior college. *See also* Ex. 1, *Pavia* Ruling at p. 24 ("The balance of equities and the public interest also weigh in favor of granting the injunction.").

## IV.    Injunctive Relief Serves the Public Interest of Promoting Free and Fair Competition in Labor Markets.

45.     Temporary and preliminary injunctive relief preventing Defendant from enforcing the Intercollegiate Competition Rules would serve the public interest in promoting free and fair competition in labor markets guaranteed by the antitrust laws. Despite the absence of a formal employee-employer relationship between NCAA member institutions and college athletes, the commercial nature of transactions between these institutions and college athletes creates the functional equivalent of a labor market in NCAA athletics. College athletes compete for scholarship positions on NCAA rosters, and NCAA member institutions compete for the best college athletes, providing them with scholarships and other benefits to attend the institution in exchange for participation on a given athletic team. "Free and fair competition in labor markets is essential to the American economy. Protecting competition in the labor market for NCAA Division I college athletes serves the public's interest in free and fair competition in labor markets." *State of Ohio*, 706 F.Supp.3d at 600. *See also* Ex. 1, *Pavia* Ruling at p. 24 ("[T]he public interest is served by promoting free and fair competition in the labor markets.").

**V.    To Effectuate This Court's Injunctive Relief, the NCAA Must Be Enjoined From Enforcing The Rule of Restitution: Bylaw 12.11.4.2.**

46.     The Rule of Restitution (Bylaw 12.11.4.2), in a nutshell, provides that, if a plaintiff obtains an injunction against the unlawful conduct of the NCAA, and a college athlete and his or her member institution conduct themselves in conformity with that injunction, the NCAA may impose draconian punishments on both the athlete and the institution if the injunction is "vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified." Ex. 6 at 66–67, Bylaw 12.11.4.2.

47.     As noted by other courts, "[t]he breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor.  It is in fact a measure designed to inhibit a person's access to the courts."  *State of Ohio*, 706 F. Supp. 3d at 601.  For example, a college athlete could obtain a preliminary injunction to play during his final year of eligibility and, once the season is over, not wish to incur the cost and effort of continuing to litigate and instead wish to voluntarily dismiss.  Alternatively, a court could determine that the athlete's eligibility had ended and the case is thereby mooted, resulting in dismissal. In both instances, the NCAA could impose harsh penalties in retaliation against the college athlete and the athlete's school even though the only court to consider the issue had ruled in the college athlete's favor.

48.     In its first injunction in this case, this Court enjoined enforcement of the Rule of Restitution. Ex. 1, *Pavia* Ruling at p. 25 ("the Court also finds it necessary to enjoin the NCAA from enforcing Bylaw 12.11.4.2, commonly known as the Rule of Restitution, against Pavia, Vanderbilt University, and any Division I institution for which Pavia chooses to play in 2025. "). Likewise, in the *State of Ohio* case, the Court enjoined any enforcement of the Rule of Restitution, finding the Rule of Restitution's "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor."  *State of Ohio*, 706 F. Supp. 3d at 601.

49.     Similarly in this case, absent relief enjoining the Rule of Restitution, if this Court

was to determine preliminarily that the Intercollegiate Competition Rules are unlawful and preliminarily enjoin their enforcement, schools may still not allow Plaintiffs to play for fear of future retaliation by the NCAA. For these reasons, any temporary restraining order or injunction order should also enjoin the NCAA from enforcing its Rule of Restitution—or taking any other action to "hold accountable" colleges that support their players—an area of concern to Plaintiffs in light of the November 13, 2025 NCAA memo whereby the NCAA threatened its own member institutions if they support their players in this (or any other) lawsuit.[22]

## SECURITY

50. Plaintiffs respectfully request that this Court not require security prior to issuing a temporary restraining order or preliminary injunction in this case. Should this court issue initial injunctive relief, Defendant will not suffer financial burden in compliance with such injunctive relief because the requested injunctive relief does not require any affirmative steps on the part of Defendant. Rather, it would prevent Defendant from enforcing the Intercollegiate Competition Rules as to Plaintiffs and enforcing the Rule of Restitution against Plaintiffs or any member institution connected to them. As with the *Pavia* case and the West Virginia case, the Court need not require any security "because the NCAA will not suffer financial burden in compliance with [the requested] injunctive relief." *Id.* at 602; Ex. 1, *Pavia* Ruling at p. 25.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter an order maintaining the status quo by enjoining Defendant from enforcing the Intercollegiate Competition Rules as to Plaintiffs pending entry by the Court of a final judgment in this action. Further, Plaintiffs respectfully request that this Court enjoin Defendant from retaliating against Plaintiffs or any NCAA member institutions by punishing them under the Rule of Restitution, NCAA Bylaw

---

[22] Ex. 21, Declaration of J. Vaughn at 5, quoting Nov. 13, 2025 NCAA Board Email ("Coaches and other athletics department officials who encourage these lawsuits, and even support them … are depriving future student-athletes of meaningful opportunities to compete. The Division I Board will explore fair ways to hold accountable institutions electing to not follow the rules that they have supported.").

12.11.4.2, for conduct allowed by any preliminary injunctive relief that this Court may issue.

Respectfully submitted,

*/s/ Ryan Downton*
Ryan Downton
Texas Bar No. 24036500
The Texas Trial Group
875 Carr 693, Ste. 103
Dorado, PR 00646*
Phone: 512-680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

and

Salvador M. Hernandez (# 020121)
Riley & Jacobson, PLC
1906 West End. Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com

24

## CERTIFICATION OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served upon the following person(s) via e-mail prior to filing on the ECF on the 26th day of December 2025:

Taylor Askew
Holland & Knight
511 Union St., Ste. 2700
Nashville, TN 37219
Taylor.askew@hklaw.com

*Counsel for the NCAA*

*/s/ Salvador M. Hernandez*
Salvador M. Hernandez