# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### AT NASHVILLE

DIEGO PAVIA, CHRISTOPHER BELLAMY, )
DEMARCUS GRIFFIN, TJ SMITH, )
TREVONTE "TRE" RICHARDSON, TRENT )
HUDSON, ANDREW BURNETTE, JAMES )
DJONKAM, IMAN OATES, JOSE "JOEY" )    **Case No. 3:24-cv-01336**
AGUILAR, AZARIAH "BEAR" LEVELLS, )
JACOB DE JESUS, DAVID MURPHY, JA'IR )    **CHIEF JUDGE CAMPBELL**
SMITH, ANTHONY FRIAS II, AMANI GIVENS, )
ZELMAR VEDDER, ALEXANDER JONES, )
JADEN MOSLEY, EDDY TOUSSOM, KYRI )
SHOELS, JAMARIEN WHEELER, EMERY )
FLOYD, JAYDEN DIXON-VEAL, NADAME )
TUCKER, QUINTRAYVION TAYLOR, and )
HOSEA WHEELER )
)
      Plaintiffs, )
)
      v. )
)
NATIONAL COLLEGIATE ATHLETIC )
ASSOCIATION, )
)
      Defendant. )
)

## SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

1.    Plaintiffs Diego Pavia, Christopher Bellamy, Demarcus Griffin, TJ Smith, Trevonte

"Tre" Richardson, Trent Hudson, Andrew Burnette, James Djonkam, Iman Oates, Jose "Joey"

Aguilar, Azariah "Bear" Levells, Jacob De Jesus, David Murphy, Ja'ir Smith, Anthony Frias II,

Amani Givens, Zelmar Vedder, Alexander Jones, Jaden Mosley, Eddy Toussom, Kyri Shoels,

Jamarien Wheeler, Emery Floyd, Jayden Dixon-Veal, Nadame Tucker, Quintrayvion Taylor, and

Hosea Wheeler complaining of Defendant National Collegiate Athletic Association, bring this

action to challenge Bylaws 12.8, 12.02.6, and 14.3.3 of Defendant, the National Collegiate Athletic

Association ("NCAA"). These bylaws reduce the number of years former junior college football

1

players can play Division I NCAA football after transferring to an NCAA Division I school and unjustifiably restrains the ability of these college athletes to earn money through use of their name, image, and likeness ("NIL") connected to their work as a Division I football player. This action seeks declaratory and injunctive relief against Defendant for a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## INTRODUCTION AND PROCEDURAL BACKGROUND

2.        In granting a preliminary injunction in this case, this Court determined that NCAA Bylaws 12.8, 12.02.6, and 12.02.4 (collectively, the "Intercollegiate Competition Rules") were commercial in nature and, accordingly, subject to the Sherman Act. *See* Ex. 1, Pavia v. NCAA, Case No. 3:24-cv-01336, M.D. Tn., Dec. 18, 2024 Memorandum Opinion Granting Preliminary Injunction (Dkt. 41) at 4-5, 11. Then, the Court applied Rule of Reason analysis and concluded that Plaintiff Pavia had shown "a likelihood that the challenged restraints have a substantial anticompetitive effect in the labor market for college football." *Id.* at 17.

3.        Next, the Court turned to the NCAA's supposed pro-competitive rationale for the Intercollegiate Competition Rules. The NCAA argued the Intercollegiate Competition Rules: (1) "[were] necessary to preserve the character of NCAA Division I football as a differentiated athletic product;" and (2) "increase the total number of student-athletes relative to Plaintiff's proposed Rule change (expanding output) and improve the student athlete experience (quality of output)." *Id.* at 18. Finally, "the NCAA argue[d] that extending eligibility would also extend the academic careers of those student athletes thereby defeating the natural and standard degree progression timeline that is central to the NCAA's mission." *Id.* (internal quotations omitted). The Court rejected the NCAA's purported pro-competitive rationales, noting that they "appear[ed] pretextual." *Id.* at 20.

2

4. Finally, the Court ruled that "[e]ven if the NCAA's justifications were valid and not pretextual, these goals can be accomplished through the less restrictive alternative proposed by Plaintiff." *Id.* at 21. Specifically,

> "Pavia propose[d] the less restrictive alternative of changing the start of the eligibility clock in NCAA Bylaw 12.8.1 and 12.8.1.1 to be triggered based on when an athlete first registers for classes at 'an NCAA member institution' instead of when they register at a 'collegiate institution' as in the current bylaws. Likewise, the definition of "intercollegiate competition" in NCAA Bylaw 12.02.6 could be changed to reference when an athlete is "in a NCAA member institution" as opposed to "in either a two-year or a four-year collegiate institution" as in the current bylaws. Finally, Pavia proposes that the line, "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from NCAA Bylaw 14.3.3 should be deleted."

*Id.* at 21-22. This Court concluded, "Plaintiff's proposed alternative eliminates the anticompetitive harms discussed above while appearing to satisfy many of the rationales advanced by the NCAA." *Id.* at 22. Accordingly, the Court ruled that Pavia had "a strong likelihood of success on the merits of his Sherman Act claim." *Id.*

5. The Court further ruled that "the denial of the ability to play sports is irreparable harm" and that the "balance of equities and the public interest also weigh in favor of granting the injunction." *Id.* at 23-24. As a result, the Court entered an injunction precluding the NCAA from enforcing the Intercollegiate Competition Rules "*as to Pavia.*" *Id.* at 24 (emphasis in original).

6. Following this Court's ruling, on December 23, 2024, the NCAA Board of Governors issued a blanket waiver providing an additional year of eligibility to athletes similarly situated to Pavia. According to Yahoo Sports, the waiver stated:

> "'The NCAA Division I Board of Directors granted a waiver to permit student-athletes who attended and competed at a non-NCAA school for one or more years to remain eligible and compete in 2025-26,' the NCAA memo reads, 'if those student-athletes would have otherwise used their final season of competition during the 2024-25 academic year, and meet all other eligibility requirements (e.g.,

progress toward degree, five-year period of eligibility).'" [1]

The NJCAA praised the NCAA ruling in a press release, stating: "the NJCAA fully supports all two-year athletes seeking to continue their academic and athletic careers at the four-year level and is supportive of this waiver being granted to all two-year college student-athletes in a similar position as Diego Pavia."[2]

7.      Most NCAA schools and players interpreted the waiver to apply to all former junior college athletes and believed each athlete's Five Year Clock would be calculated, in accordance with this Court's analysis, based on the date the player enrolled at an NCAA school.  However, on March 14, 2025, the NCAA issued a "Q&A" to clarify that the waiver did not apply to athletes who began school at a junior college in 2019.[3]  Specifically, the NCAA stated that the waiver only provided relief from the "four seasons of competition" portion of the Intercollegiate Competition Rules, but did not provide any relief with respect to the "five year eligibility clock" under challenged Bylaw 12.8.  *Id.* at Question 6 ("Does this relief provide an extension of the period of eligibility for student athletes?  A. No. To qualify for the relief provided by the Board of Directors, a student-athlete must meet all other eligibility requirements, including the period of eligibility.").

8.      The NCAA timely appealed the Court's ruling to the Sixth Circuit and sought expedited appeal, to which Pavia agreed.  The Sixth Circuit dismissed the appeal as moot because the preliminary injunction only applied to the 2025-26 season and the NCAA had already granted a waiver as to that season.  Accordingly, this Court regained jurisdiction over the case once the Sixth Circuit issued its mandate on October 23, 2025.  The Court consolidated another case,

---

[1] *See* Ex. 2 – *NCAA agrees to waiver for JUCO players after Diego Pavia lawsuit injunction*, Dellenger, R., Yahoo Sports, Dec. 24, 2024, available at: https://sports.yahoo.com/ncaa-agrees-to-waiver-for-juco-players-after-diego-pavia-lawsuit-injunction-214903548.html (last visited July 2, 2025).
[2] Ex. 3, Dec. 23, 2024 NJCAA Press Release.
[3] *See* Ex. 4, NCAA "Question and Answer Document."

*Bellamy, et al. v. NCAA* into this case on November 4, 2025.

9.     Plaintiffs in this case all started their collegiate football careers at junior colleges prior to transferring to NCAA Division I schools.  While the Court's first preliminary injunction only applied to one player for one year, they seek preliminary and permanent injunctive relief for themselves as follows: (1) the NCAA's Five Year Eligibility Clock does not start to run until a player enrolls in an NCAA school or other four-year collegiate institution; (2) seasons of competition at junior colleges do not count against the NCAA's season of competition limit; (3) to the extent their Five Year Eligibility Clock expired during the pendency of this lawsuit, that it be extended to allow them to compete during the 2026-27 season.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action under Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 4 and 26 of the Clayton Act, 15 U.S.C. § 26, and under 28 U.S.C. §§ 1331 and 1337.

11.     This Court may exercise personal jurisdiction over Defendant because, *inter alia,* the NCAA: (a) currently transacts substantial business within the geographical boundaries of the Nashville Division of the Middle District of Tennessee; (b) conducts athletic competitions, ticket and merchandise sales, television agreements, and other revenue-generating activities in the District along with its member institutions; (c) has substantial contacts with the United States, including in this District; and (d) is engaged in an illegal anticompetitive scheme that is directed at and has the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District. Moreover, several NCAA Division I institutions are found within this District, *i.e.,* Vanderbilt University, Belmont University,

5

Tennessee State University, Middle Tennessee State University, Austin Peay University, Tennessee Tech University and Lipscomb University.

12. Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b)(2) because the NCAA transacts business and is found within this District and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

**THE PARTIES**

13. Plaintiff Diego Pavia is a college football player at Vanderbilt University in Nashville, Tennessee. He played college football at a junior college for two years before transferring to an NCAA Division I college (New Mexico State University) and then to Vanderbilt University.

14. Plaintiff Christopher Bellamy is a college football player who was accepted to Vanderbilt University in Nashville, Tennessee and promised a roster spot on the 2025-26 Vanderbilt football team. He lives in the Middle District of Tennessee at 100 Ransom Ave., Nashville, Tennessee 37205. He played college football at two junior colleges before transferring to New Mexico State, where he graduated with a Bachelor's degree in Individualized Studies. Vanderbilt University held a roster spot for him for the 2025-26 season where he could play with his former teammates Diego Pavia and Eli Stowers. Even though the Court denied his request for a preliminary injunction to play this season, Bellamy still hopes to play a final season of football next year.

15. Plaintiff Demarcus Griffin is a college football player at Louisiana Tech University. Excluding his time at junior college, he has played in three seasons of competition over four years enrolled at four-year institutions.

6

16.     Plaintiff TJ Smith is a college football player who began his career at a junior college, before playing at an NCAA Division II school and then Florida Atlantic University, an NCAA Division I school.  Excluding his time at junior college, he has played in three seasons of competition over four years enrolled at four-year institutions.

17.     Plaintiff Trevonte "Tre" Richardson is a college football player at Vanderbilt University.  Excluding his time at junior college, he has played in two seasons of competition over two years enrolled at four-year institutions.

18.     Plaintiff Trent Hudson is a college football player at Vanderbilt University. Excluding his time at junior college, he has played in three seasons of competition over three years enrolled at four-year institutions.

19.     Plaintiff Andrew Burnette is a college football player at Louisiana Tech University. Excluding his time at junior college, he has played in three seasons of competition over three years enrolled at four-year institutions.

20.     Plaintiff James Djonkam is a college football player at Virginia Tech University. Excluding his time at junior college, he has played in three seasons of competition over four years enrolled at four-year institutions.

21.     Plaintiff Iman Oates is a college football player at Oklahoma State University. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

22.     Plaintiff Azariah "Bear" Levells is a college football player at the University of New Mexico. Once you exclude his time in junior college, he has competed in two seasons in two years at four-year institutions.

23.     Plaintiff Jose "Joey" Aguilar is a college football player at the University of

Tennessee. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

24. Plaintiff Jacob De Jesus is a college football player at the University of California at Berkeley. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

25. Plaintiff David Murphy is a college football player at the University of New Mexico. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

26. Plaintiff Ja'ir Smith is a college football player at the University of California at Berkeley. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

27. Plaintiff Anthony Frias II is a college football player at the University of California Los Angeles. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

28. Plaintiff Amani Givens is a football player at Louisiana Tech University. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

29. Plaintiff Zelmar Vedder is a football player at the University of Houston. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

30. Plaintiff Alexander Jones is a football player at the University of Illinois. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

31. Jaden Mosley is a football player at Samford University. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

32. Eddy Toussom is a football player at the University of Alabama-Birmingham.

8

Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

33. Kyri Shoels is a football player at San Jose State University. Excluding his time in junior college, he has competed in one seasons in two years at four-year institutions.

34. Jamarien Wheeler is a football player at Eastern Michigan University. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

35. Emery Floyd is a football player at East Texas A&M University. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

36. Jayden Dixon-Veal is a football player at the University of California at Berkeley. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

37. Nadame Tucker is a football player at Western Michigan University. Excluding his time in junior college, he has competed in two seasons in four years at four-year institutions.

38. Quintrayvion Taylor is a football player at Troy University. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

39. Hosea Wheeler is a football player at the Indiana University. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

40. Defendant NCAA is an unincorporated association that acts as the governing body of college sports. The NCAA includes more than 1,100 member colleges and universities throughout the United States, including institutions in the Middle District of Tennessee. These member institutions are organized into three divisions, and Division I includes over 350 schools. Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports, including specifically, the Bylaws at issue in

this case, Division I Bylaws 12.8, 12.02.6, and 14.3.3. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and various NCAA councils, and they may be amended by votes of the member institutions or NCAA councils. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its member institutions and among NCAA member institutions.

41.     As a practical matter, an academic institution that wishes to participate in any meaningful way in the highest and most popular level of collegiate athletics must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. Failure to abide by these rules and regulations risks subjecting sports programs at the academic institution to punitive measures from the NCAA that include reduced athletic-scholarships, suspensions, prohibition on post-season eligibility, vacating previously earned wins, monetary fines, and the so-called "death penalty."

42.     The NCAA and its member institutions control the highest and most popular level of collegiate athletics. Therefore, any individual who wishes to provide athletic services in exchange for the payment of partial or full tuition for an undergraduate academic education and wishes to derive the substantial benefits from competing at the highest level of collegiate athletics must by necessity attend an NCAA Division I member institution.

43.     There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA athletic schools: (i) the ability to exchange athletics services for the payment of the partial or full cost of an education plus room and board, (ii) high quality academic educational services, (iii) top-of-the-line training facilities, (iv) high quality coaches that will best be able to launch players to professional careers, (v) national publicity through national championships and nationwide broadcasting contracts, (vi) opportunities to profit from NIL

agreements, and (vii) competition at the highest level of collegiate athletics.

**FACTUAL BACKGROUND**

## I.    Four Year Colleges Are Governed by The NCAA.

44.    The NCAA "is a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion."[4] "The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. The NCAA comprises three Divisions. Of the NCAA's eleven hundred schools, approximately three hundred and fifty schools compete in Division I. Division I itself is divided, for the purposes of football competition, into two subdivisions, one of which is the FBS. There are thirty-two conferences in Division I. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors."[5]

45.    But while the NCAA started out as a small nonprofit organization, its economic power has grown exponentially over the last 120 years. Today, "the NCAA generates approximately one billion dollars in revenues each year…. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $5.64 billion. The five conferences with the largest revenues, known as the Power Five [now Power

---

[4] Ex. 6, 2024-25 NCAA Division I Manual.
[5] *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*, 375 F. Supp. 3d 1058, 1062 (N.D. Cal. 2019) (internal citations omitted) (invalidating other NCAA rules limiting the ability of college athletes to earn money).

11

Four] Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them…. [The] SEC made more than $409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $650 million that year[]. The revenues of the Power Five [now Power Four] have increased over time and are projected to continue to increase."[6]

46. It is the NCAA's mission to "provide student-athletes with the opportunity to **participate in sports and compete as a vital, co-curricular part of their educational experience**.... The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an **integral part of the education program** and the student-athlete as an integral part of the student body." 2024-25 NCAA Manual (emphasis added). In other words, the NCAA concedes that the ability to participate in college sports is both "vital" and "integral" to the four-year college experience.

## II. Junior College Are Governed by The NJCAA and the CCCAA.

47. In contrast to the four-year colleges governed by the NCAA, most two-year colleges ("Junior Colleges") are governed by the National Junior College Athletic Association ("NJCAA")[7] and the California Community College Athletic Association ("CCCAA"), neither of which has any affiliation with the NCAA. Each year, more than 60,000 student-athletes from 500 member colleges compete in 27 NJCAA different sports. While the NCAA generates billions of dollars in revenue while televising nearly all Power 5 [now Power 4] conference games, it took the NJCAA until 2022 to reach an agreement with ESPN to nationally televise just one NJCAA game (the junior college national championship game), with 13 additional games available through

---

[6] *Id.* at 1063.
[7] One hundred junior colleges in California are governed by the California Community College Athletic Association, which also has no affiliation with the NCAA.

an online streaming platform.[8]  To be clear, while the NJCAA streams a total of 13 games over its entire season, the NCAA televised forty games just last Saturday alone, and televises a similar number every single week of the season (not to mention several games on other nights of the week).[9]  In short, playing for a junior college is not a comparable alternative to playing Division I College Football in terms of exposure—either to generate income while in college through compensation for use of their name, image, and/or likeness ("NIL Compensation") or to NFL scouts for future career opportunities.

48.     Indeed, while the 2024 NIL market for college football is estimated at $1.1 billion, **only $6.5 million – less than six tenths of one percent – went to non-NCAA Division 1 football players**.[10]

### III.     The NCAA Is Governed by Self-Created Bylaws That Discriminate Against Junior College Athletes.

49.     Each NCAA division maintains its own bylaws, with amendments proposed by member institutions.  *See* Ex. 6 at pp. 14, 17-18.  Each NCAA member school is required to "hold itself accountable to support and comply with the rules and principles approved by the membership."  *Id.* at p. 9.  Several of the bylaws applicable to Division I schools are at issue in this lawsuit.

### A.     The Five-Year Rule and Eligibility Clock: NCAA Bylaw 12.8

50.     Under NCAA Bylaw 12.8, an athlete has five years of eligibility to play four seasons of "intercollegiate competition" in his or her chosen sport (the "Five-Year Rule").  The

---

[8] *See* 2022-23 NJCAA Annual Report at p. 18 (last viewed on November 3, 2024 at https://www.njcaa.org/about/annual_report/index).

[9] *See*, e.g. https://www.usatoday.com/story/sports/ncaaf/2024/11/02/college-football-schedule-week-10-saturday/75918275007/ (last accessed Nov. 3, 2024).

[10] *See* Ex. 7, "NIL at 3: The Annual Opendorse Report" at p. 4.

13

athlete's five-year window is known as an "Eligibility Clock" and starts to run from the date on which an athlete registers as a full-time student at any "collegiate institution," whether or not such institution is a member of the NCAA and whether or not the athlete competes in any sport at the non-NCAA institution. Ex. 6, at p. 66, NCAA Bylaw 12.8.1

51.     The NCAA's Guide for Two Year Transfers has a section on the Eligibility Clock, where it explains that the purpose of the five-year rule is to "move student-athletes toward graduation in a timely manner." Ex. 5, NCAA Guide for Two Year Transfers 2024-25 at p. 21. In other words, the NCAA concedes that the Five-Year Rule is not designed for any pro-competitive purpose.

52.     The irrelevance of the Eligibility Clock start date to competitive balance becomes even more apparent when one realizes that the five-year clock begins to run whether a student plays a sport or not. Under the Bylaw, a student can attend a junior college for two years without playing any sports, obtain an associates degree, transfer to a four-year NCAA school, and the student still only has three years of eligibility to play three seasons of football—and earn NIL.

53.     In contrast, a student who graduates from high school, plays football at a prep school for a post-grad year, and then attends an NCAA school still receives five years of eligibility to play four seasons. Similarly, a student who graduates high school and becomes a professional athlete in another sport can play that other sport for years, then go to college and still have five years of eligibility to play four seasons of a sport – as long as it is a different sport than they played professionally. The NCAA rules do not limit the ability of the former professional athlete to profit from NIL while playing Division I football, even though they have had a chance to physically mature well beyond a typical 18-year-old college freshman. For instance, Chris Weinke entered Florida State University as a freshman following a six-year professional baseball career and ended

14

up winning the Heisman Trophy, awarded annually to the most outstanding player in college football, at 28 years of age.[11] Accordingly, it is apparent that the Five-Year Rule does not exist for reasons of competitive balance else it would preclude other older athletes from competing in Division 1 NCAA sports.

**B.     The "Intercollegiate Competition Rule": NCAA Bylaw 12.02.6**

54.     The NCAA defines "intercollegiate competition" as "occur[ring] when a student-athlete in either a **two-year** or a four-year collegiate institution does any of the following: ... (a) Represents the institution in any contest against outside competition." Ex. 6 at p. 46, NCAA Bylaw 12.02.6. In other words, while junior colleges are not part of the NCAA monopoly and JUCO athletes have no meaningful opportunity to earn NIL Compensation, the NCAA still subtracts one season of NCAA Division I eligibility from an athlete for each year he/she competes at a junior college.

**C.     The "Three Year Transfer Limitation": NCAA Bylaw 14.3.3**

55.     In addition to the Five-Year Rule and the Intercollegiate Competition Rule, the NCAA also limits all junior college attendees to a maximum of three years of NCAA Division 1 competition – regardless of whether they compete in a junior college sport: "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I." Ex. 6 at p. 161, NCAA Bylaw 14.3.3. There is no pro-competitive justification for this rule that takes away one year of Division I football competition (with corresponding NIL Compensation opportunities) from students who choose to attend junior college before transferring to an NCAA school, as compared with athletes who enroll directly in a school that is a member of the NCAA

---

[11] *See* https://en.wikipedia.org/wiki/Chris_Weinke (last accessed on Nov. 6, 2024).

monopoly.

56.     The NCAA amplified the magnitude of the anticompetitive nature of the Three Year Transfer Limitation during the Covid pandemic when it issued guidance allowing some students to compete for more than four years in a window greater than five years.  Specifically, any student that enrolled at an NCAA Division 1 school in the Fall of 2020 received a one-year extension on their Eligibility Clock **and** had their 2020 year disregarded as a season of participation, effectively giving them six years to play five seasons at the NCAA Division 1 level (the "Covid Extension").[12] For instance, one athlete, Bo Nix, started at quarterback for Auburn University for three seasons, then transferred to the University of Oregon and started at quarterback for two additional seasons, starting in a record total of 61 Division 1 football games during his career before being selected in the first round of the 2024 NFL draft.[13]

57.     The anti-competitive nature of the Covid Extension combined with the Three-Year Transfer Limitation is facially apparent.  Under the Three-Year Transfer Limitation, the NCAA already disadvantaged former junior college players by limiting them to three seasons of Division I competition in comparison to the four seasons granted to all other football players.  Then, the Covid Extension increased the four-season limit to five seasons for football players who enrolled in Division I schools upon high school graduation, while leaving the three-season limit in place for JUCO transfer athletes.  Instead of having one less year of NCAA Division I competition, former JUCO football players now have two fewer years.  JUCO football players immediately felt the impact of the Covid Extension on their Division I opportunities as the number of junior college football transfers to "Power 5 Conferences," the most well-known (and lucrative) Division I

---

[12] *See* Ex. 8, NCAA Division I COVID-19 Self-Applied Waiver Relief for Season of Competition and Extension of Eligibility.
[13] *See* https://en.wikipedia.org/wiki/Bo_Nix.

16

college football conferences, dropped in half, from an average of 114 per year before the Covid Extension (2018-2020) to 54 per year in the first three years after the Covid Extension became effective (2021-23).[14]

### D. Application of Intercollegiate Competition Rules to Plaintiffs

#### 1. Christopher Bellamy

58.     Plaintiff Christopher Bellamy played football at Vermillion Community College in 2019.  He transferred to Coffeyville Community College in 2020, but Coffeyville did not play football that year due to Covid.  Bellamy played football for Coffeyville in 2021.  Vermillion and Coffeyville are both junior colleges and members of the NJCAA.  Bellamy transferred to New Mexico State University and played football in the 2022 and 2023 seasons.

59.     Under the NCAA rules as they currently exist, Bellamy's five-year clock expired at the end of the 2024 season.  Under Pavia's proposed change to the NCAA rules, Bellamy would have time remaining on his five-year eligibility clock because he did not enroll in an NCAA school until 2022.  However, because the NCAA's Q&A document indicated the *Pavia* Waiver did not include relief from the Five-Year Eligibility Clock, Bellamy did not think he would become eligible again even though he had only competed in two seasons of NCAA football.

60.     Then, in the wake of the *Elad* ruling, Bellamy gained hope of playing college football again.  He immediately retained counsel, who reached out to the NCAA the day after the *Elad* decision (April 26, 2025) to seek his reinstatement.[15]  The NCAA directed Bellamy to file an individual waiver request as it had not yet decided on a blanket waiver.[16]  The NCAA also noted that Bellamy needed to find a school that was interested in him and willing to file a waiver request

---

[14]     https://www.nytimes.com/athletic/4157194/2023/02/08/transfer-portal-junior-college-recruiting/ (last visited on Nov. 5, 2024).

[15] *Id.*at ¶ 5; Ex. 9, Downton emails with NCAA.

[16] Ex. 9, Downton emails with NCAA.

on his behalf.[17]

61.     Bellamy began the process of enrolling in Vanderbilt University and Vanderbilt submitted a waiver request on his behalf on May 16, 2025.  The waiver was denied on June 23, 2025 because "as his five-year period of eligibility has expired," he was not injured for two full seasons, and he was "unable to demonstrate otherwise extraordinary circumstances."[18]  Bellamy was understandably frustrated because the NCAA did nothing more than affirm its previously stated position.  But for the NCAA's directive to file for an individual waiver based on the *Elad* ruling, Bellamy could have been before the Court more than a month before Bellamy filed his original Complaint.

62.     To the extent this Court would provide relief with respect to *all* of the Intercollegiate Competition Rules for former junior college players, like *Pavia*, Bellamy's five-year clock did not begin to run until 2022 and he has not yet played four seasons of NCAA football.  Accordingly, he should be eligible for injunctive relief on the same bases and for the same reasons as Diego Pavia.  Unfortunately, because the NCAA construed its *Pavia* Waiver as narrowly as possible and has not (to counsel's knowledge) granted any additional waivers in the wake of the *Elad* decision, Bellamy had to pursue this lawsuit to regain eligibility.

63.     Bellamy began working out with Vanderbilt players in early May 2025 in the wake of the *Elad* ruling, but given the NCAA's denial of his waiver on June 23, 2025, Vanderbilt has told him he cannot participate in any team activities unless he receives a Court order allowed him to do so.  This Court denied his request for preliminary injunction on August 7, 2025.  Bellamy seeks an opportunity to play NCAA Division I football in the 2026-27 year.

---

[17] *Id.*
[18] Ex. 10, NCAA Ruling Denying Bellamy Waiver.

## 2. Demarcus Griffin

64.     Plaintiff Demarcus Griffin attended Independence Community College from the Fall of 2019 through the Spring of 2021.  Independence is a member of the NJCAA.  Demarcus played football at Independence in 2019, but Independence only played a partial Spring season in the 2020-21 school year due to Covid, which does not count toward his eligibility under NCAA rules.  Demarcus subsequently transferred to the University of Houston (an NCAA school) and redshirted during the 2021 season.  Demarcus played football at Houston during the 2022 season, then transferred to Louisiana Tech, where he played in 2023 and 2024.

65.     Under the logic of *Pavia*, Demarcus's Five-Year Eligibility Clock should have begun when he enrolled at the University of Houston, leaving him with one remaining year of eligibility.  Likewise, because he redshirted in 2021, Demarcus would also have one year of Intercollegiate Competition remaining.  Demarcus and Louisiana Tech both believed Demarcus had an additional season of competition available in the Fall of 2025 based on the logic of this Court's ruling and the *Pavia* waiver.  However, the NCAA issued guidance that indicated the *Pavia* waiver did not apply to Demarcus.

66.     In light of the *Elad* decision, Louisiana Tech applied for a waiver for Demarcus on May 5, 2025.  The NCAA denied the waiver request on June 13, 2025 because Griffin "does not meet 'all other eligibility requirements' as his five-year period of eligibility has expired," he was not injured for two full seasons, and he was unable to "demonstrate otherwise extraordinary circumstances."[19]  Louisiana Tech noted, "[t]he NCAA staff on the phone mentioned that they aren't following what the courts decide but are applying the NCAA standards for relief instead. the fact that [Jett Elad's] lawsuit was successful didn't change how it was applied at the NCAA level.

---

[19] Ex. 11, Griffin Ruling.

They told us that Demarcus would need to get relief via the legal route."[20]  Plaintiffs do not understand why the NCAA directed schools to file individual waiver requests for athletes in the wake of the *Elad* decision if they intended to deny all of them.  Rather, it appears the NCAA was attempting to run out the clock and prevent more players from seeking legal redress in time to play in the upcoming season.

67.     The Court denied Demarcus's request for preliminary injunctive relief on August 7, 2025.  He seeks an opportunity to play NCAA Division I football in the 2026-27 year.

### 3.     TJ Smith

68.     Plaintiff TJ Smith played football at Iowa Western Community College in 2019 and 2020 (the Covid year).  Iowa Western is a junior college and member of the NJCAA.  In 2021, Smith transferred to Upper Iowa, an NCAA Division II school.  He transferred to Florida Atlantic University, an NCAA Division I school, and redshirted in 2022, then transferred to North Alabama and played football there in 2023 and 2024.

69.     TJ Smith filed a Declaration with this Court in connection with the *Pavia* case.  However, he was not a plaintiff, so the *Pavia* injunction did not apply to him, and, like Bellamy, he started at a junior college in 2019.  As a result, the NCAA's *Pavia* waiver did not apply to him because (counting his time in junior college) his Five-Year Eligibility Clock expired at the end of the 2024 season.

70.     After the *Elad* decision, Smith attempted to find a school to file a waiver on his behalf.  While multiple NCAA Division I schools have expressed interest in Smith joining their football teams for the 2025 season, none have been willing to spend the time and effort on filing a waiver request on his behalf and the NCAA does not allow players to submit their own waivers.

---

[20] Ex. 12, June 30, 2024 Email from Louisiana Tech.

As a result, Smith still hoped to play college football in 2025, but faced a chicken and egg problem, with no ability to file a waiver request without a football team and no ability to join a football team without a waiver.

71.    The Court denied Smith's request for preliminary injunctive relief on August 7, 2025. However, multiple schools including, but not limited to, the University of Florida, Florida State University, and the University of Miami, have had conversations with him about playing for them in the 2026-27 year if he can regain eligibility.

### 4.    Trevote "Tre" Richardson

72.    Plaintiff Trevonte "Tre" Richardson is a college football player at Vanderbilt University.  He played college football at a Hutchinson junior college for one year before transferring to Washburn College, an NCAA Division II school, where he played one season of football, and then Vanderbilt, an NCAA Division I school, where he is currently enrolled and on the football team.  Excluding his time in junior college, he has only competed in two seasons in two years at four year institutions.  He is already eligible for the 2026-27 season, but seeks eligibility for 2027-28.

### 5.    Trent Hudson

73.    Plaintiff Trent Hudson is a college football player at Vanderbilt University.  He played football at Trinity Valley Community College, a junior college in Texas, for two years before transferring to New Mexico State University, an NCAA Division I school, where he played one season of football, then Mississippi State University, where he redshirted and received a Bachelor's Degree in the Division of Unclassified Studies, and now Vanderbilt, where he is currently enrolled and on the football team.  He would study business if given another year of eligibility.  Excluding his time in junior college, he has only competed in two seasons in three

years at four year institutions.

### 6.    Andrew Burnette

74.    Plaintiff Andrew Burnette is a college football player at Louisiana Tech University. He played college football at two junior colleges: Highland Community College and Independence Community College in 2021-22, then took community college online classes in 2022-23, but did not play football.  Subsequently, he played football at Keiser University (an NAIA school) in the 2023-24 and 2024-25 seasons before transferring to Louisiana Tech where he is playing this year. He wants to continue playing college football in the 2026-27 season.  Excluding his time in junior college, he has competed in only three seasons in three years at four-year institutions.

### 7.    James Djonkam

75.    Plaintiff James Djonkam is a college football player at Virginia Tech University. He played football at Independence Community College from 2020-22, then transferred to Arizona State University from 2022-24, Eastern Michigan from 2024-25 and started this year, his fourth season of Division I competition, at Virginia Tech University.  Unfortunately, three games into this season, Virginia Tech fired his head coach, who had recruited him to come play at Virginia Tech. As a result, he decided to explore his option to enter the 30-day NCAA transfer portal specifically created for players whose coaches are fired.  Because he has only played in three games so far this year, this year still qualifies as a redshirt season and would not count against his seasons of competition.  However, Virginia Tech's compliance department (correctly) told him that he would still be out of eligibility after this season because his Five Year Clock began to run while he was in junior college and the *Pavia* Waiver did not extend beyond this season.

76.    After discussing with his advisors the problem of the Five Year Clock in the absence of the *Pavia* Waiver for next season, Djonkam told Virginia Tech that he would stay with the team

22

and play the remainder of the season without redshirting. Unfortunately, the interim coach told him that he could not stay with the team because other players already knew that he wanted to redshirt and it would set a bad precedent for the program. Accordingly, Djonkam has no choice but to join this lawsuit seeking a final year of eligibility in 2025-26 after redshirting this season. He has already graduated from and will continue to work on his Master's degree at Virginia Tech this semester.

### 8. Iman Oates

77.    Plaintiff Iman Oates is a college football player at Oklahoma State University. He played football at Northeastern Oklahoma A&M (a junior college) from 2021-23, then transferred to Oklahoma State University, where he redshirted in 2023-24, and has played in the 2024-25 and 2025-26 seasons. He has completed his undergraduate education and seeks additional time in college to complete an additional degree in marketing. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

### 9. Azariah "Bear" Levells

78.    Azariah "Bear" Levells played two years at Chaffey Junior College (2022-23 and 2023-24), then one year at Stephen F. Austin University (2024-25) and the current year (2025-26) at the University of New Mexico. He will finish his Bachelor's degree in May and seeks additional time in college to work towards a Master's degree. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

### 10. Jose "Joey" Aguilar

79.    Jose "Joey" Aguilar played football at Diablo Valley Community College in 2021-22 and 2022-23,[21] before transferring to Appalachian State University, an NCAA Division I

---

[21] Aguliar also practiced with the City College of San Francisco football team in 2019, but did not play in any games.

program for the 2023-24 and 2024-25 seasons, earning a Bachelor's degree in Communications Studies. He transferred to the University of Tennessee for the 2025-26 season, where he is currently enrolled. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

### 11. Jacob De Jesus

80.     Jacob De Jesus played football at Modesto Junior College in the 2021-22 and 2022-23 seasons. Then he transferred to UNLV and played there in the 2023-24 and 2024-25 seasons. He graduated from UNLV with a Bachelor's degree in Business Administration and then transferred to UC Berkeley for the 2025-26 season. If he receives another season of eligibility, he will likely be able to receive an MBA from Berkeley. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

### 12. David Murphy

81.     David Murphy played football at Butte Junior College in the 2021-22 season. Then he transferred to the University of New Mexico, where he redshirted in 2022-23, then played in 2023-24, 2024-25, and 2025-26. He graduated with a Bachelor's degree of Business Administration this Fall and hopes to pursue an MBA or a Master's degree in project management if he gets to play another season. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

### 13. Ja'ir Smith

82.     Ja'ir Smith played football at the San Mateo Junior College in 2022-23 and 2023-24 before transferring to the University of California at Berkeley for the 2024-25 and 2025-26 seasons. He will graduate with a Bachelor's degree in American Studies with a concentration in digital media in the Spring of 2026 and would focus on a concentration in digital media with the goal of getting accepted into a Master's degree program if he is able to play another year.

Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

### 14. Anthony Frias II

83. Anthony Frias II played football at Modesto Junior College from 2021-22. Then he transferred to Kansas State University, where he redshirted in the 2022-23 season and played in the 2023-24 season. Frias transferred to UCLA and played in the 2024-25 and the present 2025-26 season. He received an Bachelor's degree in Psychology in 2023 and expects to graduate this semester with a Master's Degree. He would like to pursue a doctorate if he receives another year of eligibility. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

### 15. Amani Givens

84. Amani Givens played football at El Camino Junior College in the 2022-23 and 2023-24 seasons. Then he transferred to Louisiana Tech, where he played football in the 2024-25 and 2025-26 seasons. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

### 16. Zelmar Vedder

85. Zelmar Vedder played at Modesto junior college in the 2021-22 season. He transferred to Sacramento State and redshirted in the 2022-23 season before playing in the 2023-24 and 2024-25 seasons. He graduated from Sacramento State in May of 2025 with a Bachelor's degree in communications, then transferred to the University of Houston where he is currently playing football in the 2025-26 season. He would continue to pursue a Master's degree if he can play in 2026-27. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

### 17. Alexander Jones

86. Alexander Jones played football at Moorpark Junior College in the 2021-22 and 2022-23 seasons. Then he transferred to the University of Illinois and redshirted there in the 2023-24 season, before playing in the 2024-25 and 2025-26 seasons. He graduated with a Bachelor's degree in Communications in May 2025 and is currently pursuing an MBA. However, Illinois will not pay for the Spring Semester of business school in 2026 or any part of his Fall 2026 educational expenses unless he gets another year of eligibility. Excluding his time in junior college, he will has competed in two seasons in three years at four-year institutions.

### 18. Diego Pavia

87. Plaintiff Diego Pavia was a three-time New Mexico state finalist in wrestling at the 160 lbs. weight class, winning one state championship. But at that weight class and at only six feet tall, Pavia had no offers to play Division I football when he graduated from high school in 2020. As a result, he enrolled at the New Mexico Military Institute in the Fall of 2020. He only got to play eight games of a partial season that year due to the Covid lockdown gripping the United States. Pavia had no opportunity to earn NIL Compensation in 2020.

88. In 2021, Pavia led the New Mexico Military Academy to the NJCAA National Football Championship. Despite winning a national championship, Pavia had no opportunity to earn NIL Compensation in 2021.

89. In 2022, Pavia transferred to New Mexico State University, an NCAA Division I member school. Pavia excelled as the starting quarterback for the New Mexico State football team in the 2022 and 2023 seasons and was named the 2023 Conference USA Offensive Player of the Year. Pavia graduated from New Mexico State in 2024.

90. In 2024, after playing only two years of Division I football, Pavia transferred to Vanderbilt University, an NCAA Division I Institution and member of the Southeastern

26

Conference. On October 5, 2024, Pavia led Vanderbilt to an upset victory over University of Alabama, the top ranked team in the United States. On November 2, 2024, Pavia led Vanderbilt to a road victory over Auburn, making Vanderbilt bowl eligible for the first time since 2018. *Id.* Following entry of the Court's injunction, Pavia has continued to play for Vanderbilt, leading it to a 6-1 start and a top 10 ranking in the Associated Press Poll for the first time in more than 70 years.

91.    As of the end of the 2025 season, Pavia will have played four seasons of Division I football and plans to play in the NFL next year. However, he has already played in more than four games this season and, as a result, cannot redshirt. Accordingly, Pavia must remain in the lawsuit to protect all of his options to the extent he is injured or faces other unforeseen circumstances for the reasons articulated in *Patterson v. NCAA*, Case No. 3-25-cv-00994, also pending before this Court.

### 19.    Jaden Mosley

92.    Jaden Mosley played football at Hutchinson Junior College for two seasons. He transferred to Samford University and played in the 2023-24, 2024-25 and 2025-26 seasons. He graduated from Samford with a Bachelor's degree in health science. He would pursue a Master's degree if he can play in 2026-27. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

### 20.    Eddy Toussom

93.    Eddy Toussom played football at Navarro junior college. He transferred to the University of Alabama-Birmingham ("UAB") and played in the 2024-25 and 2025-26 seasons. He graduated from UAB with a Bachelor's degree in sports communication. He would also be able to complete a Bachelor's degree in psychology if he can play in 2026-27. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

**21. Kyri Shoels**

94.    Kyri Shoels played at Palomar junior college for two seasons.  He transferred to San Jose State University and redshirted in the 2024-25 season before playing in the 2025-26 season.  Once you exclude his time in junior college, he has competed in one seasons in two years at four-year institutions.  He is already eligible for the 2026-27 season, but seeks eligibility for 2027-28.

**22. Jamarien Wheeler**

95.    Jamarien Wheeler played at Iowa Central junior college.  He transferred to Eastern Michigan University and redshirted in 2023-24 season, before playing in the 2024-25 and 2025-26 seasons.  He graduated from Eastern Michigan University with a Bachelor's degree in psychology.  If given another year of eligibility, he would pursue a Master's degree in clinical psychology.  Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

**23. Emery Floyd**

96.    Emery Floyd played at Antelope Valley Junior College and College of the Canyons. He transferred to the University of New Mexico for the 2024-25 season, then East Texas A&M University for the 2025-26 season.  He graduated with a Bachelor's degree in sociology.  If given another year of eligibility, he would pursue a Master's degree in sociology and a minor in business management.  Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

**24. Jayden Dixon-Veal**

97.    Jayden Dixon-Veal played at San Mateo Junior College.  He transferred to Purdue University, where he played in 2023-24 and redshirted in 2024-25.  He graduated from Purdue

28

with a Bachelor's degree in African American Studies. Then he transferred to the University of California at Berkeley for the 2025-26 season. He would join an MBA program if he can play in 2026-27. Excluding his time in junior college, he has competed in two seasons in three years at four-year institutions.

### 25. Nadame Tucker

98. Nadame Tucker played at Independence Junior College and Hutchinson Junior College. He transferred to the University of Houston and played in the 2023-24 and 2024-25 season, graduating with a Bachelor's degree in Integrated Studies. Tucker transferred to Western Michigan University for the 2025-26 season and led the country in sacks. Excluding his time in junior college, he has competed in three seasons in three years at four-year institutions.

### 26. Quintrayvion Taylor

99. Quintrayvion Taylor played at Tyler Junior College. He transferred to Coastal Carolina for the 2024-25 season, then Troy University for the 2025-26 season. He will graduate from Troy in May 2026 with a Bachelor's degree in interdisciplinary studies. If given another year of eligibility, he would study psychology. Excluding his time in junior college, he has competed in two seasons in two years at four-year institutions.

### 27. Hosea Wheeler

100. Hosea Wheeler played at Sacramento City College. He transferred to Western Kentucky University, where he redshirted in 2022-23, then played in 2023-24 and 2024-25, receiving a Bachelor's degree in Business Management. He transferred to Indiana University for the 2025-26 season. If given another year of eligibility, he would study sports management or kinesiology. Excluding his time in junior college, he has competed in three seasons in four years at four-year institutions.

29

### E. Collective Application of the Intercollegiate Competition Rules

101. Applied collectively, the Intercollegiate Competition Rules violate Section 1 of the Sherman Act by restraining the market for NCAA Division I college football players by precluding Plaintiffs and other similarly situated football players who enrolled in junior colleges from having an opportunity to earn NIL Compensation while playing four years of NCAA Division I college football. Prior to July 2025, NCAA Division I institutions directed the payment of NIL Compensation through so-called collectives made up of university donors ("Collectives"). Beginning on July 1, 2025, Division I colleges and universities began playing football players directly through revenue sharing contracts pursuant to the settlement of the *House v. NCAA* lawsuit (the "*House* Settlement"), which created a methodology whereby schools would share *up to* 22% of certain media revenue by the schools with athletes (across all sports). However, the *House* Settlement did not (and could not) eliminate the ability of Collectives and other third-parties affiliated and working in concert with Division I football programs and coaching staffs to pay players for use of their individual intellectual property rights. Now, Collectives must document a "legitimate business purpose" for payments to the athletes and the contractual agreements must be approved by the newly created College Sports Commission.[22] However, as a practical matter, agents of the NCAA member institutions (football coaches and staff members) coordinate the amount of money directed to particular players by the Collectives.[23]

102. In other words, the *House* Settlement cap on revenue sharing payments from NCAA schools to players does not change the fact that NCAA institutions effectively control payments through collectives above the *House* cap. As a result, schools can still reduce payments to athletes

---

[22] https://www.footballscoop.com/2025/07/31/official-collectives-allowed-to-continue-nil-payments-athletes-house-settlement.

[23] https://frontofficesports.com/the-year-schools-paid-their-players/ ("In addition, players can still earn NIL deals set up through the athletic department, groups of boosters and donors called NIL collectives, or outside companies…").

by "churning" players through the system and boycotting former junior college players at the peak of their NCAA earning capacity before they have completed four seasons of NCAA Division I football.

103.     The Declarations of each Plaintiff, attached under seal as compilation Exhibit 17 to Plaintiffs' Motion for Preliminary Injunction, demonstrate that most former junior college athletes earn more money each year they compete in Division I football.  Accordingly, allowing the NCAA to institute a group boycott of such athletes before they have competed in four seasons depresses market-wide compensation because the higher earning, more experienced athletes can be replaced by lower earning first year NCAA Division I athletes – whether such athletes enter from high school, a lower level of the NCAA, or junior college.

104.     Specifically, the Five-Year Rule violates the Sherman Act by starting each athlete's Eligibility Clock while the athlete is attending non-NCAA institution and is unable to earn NIL Compensation.  The Intercollegiate Competition Rule violates the Sherman Act by wrongfully equating competition at the junior college level (where little to no NIL is available) as reasonably commensurate with the opportunity to earn NIL Compensation while playing NCAA Division I football.  The Three-Year Limitation violates the Sherman Act by taking a year of NCAA Division I football and NIL earning potential away from athletes as punishment for their decision to attend a non-NCAA monopoly school prior to transferring to a four-year NCAA institution.  These practices essentially amount to a group boycott of former JUCO players before they have completed four seasons of competition in five years at an NCAA Institution.

**F.     The "Rule of Restitution": NCAA Bylaw 12.11.4.2**

105.     If the Court grants Plaintiffs injunctive relief, it must also address NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," which provides:

31

> If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but in accordance with the terms of a court restraining order or injunction operative against the institution attended by such student-athlete or against the Association, or both, and said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions . . .

Ex. 6 at 65-66, NCAA Bylaw 12.11.4.2. Potential punishments under the Rule of Restitution include vacating wins, postseason bans, return of television revenue, and financial penalties, among others. *Id.* To make a temporary restraining order and preliminary injunction meaningful in this case, Plaintiffs respectfully requests that the Court enjoin the NCAA's application of the Rule of Restitution against Plaintiffs, Vanderbilt University, Louisiana Tech, UC Berkeley, UCLA, University of Houston, University of Illinois, University of New Mexico, Oklahoma State University, University of Tennessee, or any other NCAA Division I college to which any Plaintiff could transfer because its "purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." *State of Ohio*, 706 F.Supp.3d at 601.

## RELEVANT MARKETS[24]

106.    With respect to this case, the Intercollegiate Competition Rules affect the labor market for Division 1 football players. Within the market, college athletes like Plaintiffs compete for roster spots on Division I football teams and those NCAA Division I colleges compete against each other to recruit the best college athletes to compete on their athletic teams. Junior college

---

[24] Plaintiffs antitrust analysis is supported by previously filed expert declarations of Prof. Joel Maxcy, attached hereto as Exhibits 13 and 14, along with Prof. Maxcy's testimony and cross examination by the NCAA in the *Elad* case, attached as Ex. 15, and a new Declaration from Pro. Maxcy, attached as Ex. 16.

transfer student-athletes are an important subgroup of the transfer student population, representing 7.9% of the male-student athlete population in the 2021-2022 academic year, with 8.3% of FBS football transfers and 8.0% of FCS football transfers coming from JUCOs in 2020-21.[25]  JUCO football players have represented between 6% and 10% of both FCS and FBS football transfers every year from 2004 through 2021.[26]

107.    The Intercollegiate Competition Rules also affect the consumer market for NCAA Division I football.  By boycotting former JUCO players, who are older and more experienced than the players replacing them, the Intercollegiate Competition Rules reduce the quality of football presented to the consuming public.

108.    The relevant geographic market is the United States.  The NCAA and its member institutions are located across the country, and they engage in on-field competition and competition in the relevant labor markets throughout the United States.

109.    There are no alternatives to the NIL Compensation opportunities, *House* Settlement revenue sharing opportunities, or other benefits college football players receive from participating in NCAA Division I football.[27]  The opportunity to showcase athletic skills at the highest level of

---

[25] Aldridge, D., "*Do Baseball Community College Transfers Have a Fair Shot*" at p. 14 (Available at https://cdr.lib.unc.edu/concern/dissertations/jw827p03m?locale=en and last viewed on July 2, 2025); https://ncaaorg.s3.amazonaws.com/research/transfers/RES_TransCompD1TeamsSlides.pdf, last viewed on Dec. 24, 2025.  To the best of Plaintiffs' knowledge, the NCAA has not released JUCO to NCAA Division I transfer statistics for any more recent year.

[26] *Id.*  To the best of Plaintiffs' knowledge, the NCAA has not released JUCO to NCAA Division I transfer statistics for any more recent year.

[27] The NIL market is booming—projected to reach $1.67 billion in 2024–25 (a 43.1 percent year-over-year increase), with women's-sports earnings expected to rise 15 percent and collectives outspending commercial deals at roughly a four to one ratio—demonstrating the uniqueness and magnitude of these opportunities. *See NIL at 3: The Annual Opendorse Report*, OPENDORSE, at 4 (2024), https://biz.opendorse.com/wp-content/uploads/2024/07/NIL-AT-3-The-Annual-Opendorse-Report-1.pdf#gf_56.

amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. Within this market, the NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate the rules and regulations for participation in Division I athletics. The transactions in which the NCAA and its member institutions engage in this market with college athletes are commercial in nature, as they significantly affect the future earning potential of college athletes and yield significant financial revenue for the member institutions from the sizable consumer interest in college athletics. And, as a practical matter, NIL opportunities are only available college athletes competing at NCAA Division I institutions as more than 99% of NIL dollars are paid to those athletes. *Id.* at footnote 17. Plaintiffs had no reasonable opportunity to earn any NIL Compensation, and earned none, when they played at junior college.

110. Former junior college football players that want to continue their education while receiving compensation connected to playing football have no options available to them other than the NCAA. By boycotting former junior college players after two years of NCAA competition, the NCAA has effectively locked them out of the marketplace most likely to compensate them for continuing to play football, but for the very few former junior college players who move on to NFL careers following their time at an NCAA school. Additionally, contrary to its stated goal of encouraging athletes to graduate from NCAA institutions, the NCAA unfairly limits the former junior college players to between two and three seasons of competition in which to earn their Bachelors' Degrees.

111. Although the NCAA is a non-profit organization, the transactions that member institutions make with college athletes yield significant financial revenue for the member institutions and have significant effects on the future earning potential of those college football

34

players. Namely, these transactions include partial or full scholarships in exchange for the college athlete's services. The college athletes, in return, receive the means to develop, refine, and showcase their skills—essential inputs to their future earning potential. NCAA athletic events in which these college athletes compete are marketed to consumers who view both in-person and via broadcasts of these sporting events, yielding significant revenue to the NCAA's member institutions and conferences. Accordingly, the transactions between these member institutions and the college athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

## **ANTICOMPETITIVE EFFECTS**

112.    The NCAA enacts and enforces rules that it claims promote the well-being of college athletes and preserve the amateurism aspect of Division I college sports.

113.    The NCAA and its member institutions adopt these rules through the member institutions and the Division I Council, making these rules equivalent to horizontal agreements among the NCAA and its member institutions who compete against one another for the labor of Division I college football players, including former junior college football players.

114.    Despite what the NCAA may claim, the Intercollegiate Competition Rules restrain college athletes from improving their economic opportunity, personal growth, and well-being with NIL opportunities, through a full four-year college playing experience, a freedom afforded to all athletes who enroll at NCAA Division 1 members as freshman, but not to junior college football player transfers. This restriction violates the Sherman Act because it has direct anticompetitive effects that harm college football players and consumers of college football.

## I.    **The Intercollegiate Competition Rules' Effects on College Football Players**

115.    In essence, the Intercollegiate Competition Rules amount to no more than an agreement to a group boycott limiting the amount of time athletes may play Division I football

35

because they have chosen to attend a non-NCAA institution prior to transferring to a Division I NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a Division I NCAA college to attend prep school, serve in the military, or even to compete professionally.

116. The Intercollegiate Competition Rules harm junior college and former junior college football players in four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a JUCO after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a JUCO; (3) when an athlete is deciding whether to attend a JUCO for a second year or transfer to an NCAA Division I College; and (4) when an athlete has transferred from a JUCO to a NCAA Division I College and has his/her eligibility limited to two or three years.

117. First, the Intercollegiate Competition Rules harms athletes when they are deciding what to do after graduating from high school. Upon graduating from high school, an athlete can choose between several options including, but not limited to, attending a Division I NCAA School, attending a JUCO, going to prep school, joining the military, playing a professional sport, or taking a gap year or non-sport job. All those options provide the possibility of the athlete competing for four plus years at a Division I NCAA School except one: going to JUCO.

118. Second, the Intercollegiate Competition Rules harms athletes attending a JUCO when they decide whether to participate in a sport while at that college. Specifically, if an athlete either forgoes participation in their sport of choice or limits that participation to a single year while at a JUCO, the NCAA bylaws allow them to transfer to an NCAA Division I School and play for three years.

119. Third, because the NCAA counts every JUCO season against the athlete's four

36

seasons of allowed competition at an NCAA Division I School under Bylaw 12.02.6, the Intercollegiate Competition Rules harm each athlete after their first year of JUCO by giving them an unfair set of three choices: (A) the athlete can transfer from the JUCO (without an associates' degree) to an NCAA Division 1 School with three years of eligibility remaining; (B) The athlete can choose to stay at the JUCO, play his/her sport, and obtain a degree; but by doing so, forfeit another year of NCAA Division 1 eligibility and have only two remaining; or (C) the athlete can stay at the JUCO to obtain his/her degree, but sit out from competition in his/her second year to maintain the maximum three years of eligibility allowed by the NCAA to JUCO transfers.

120. Fourth, the Intercollegiate Competition Rules harm athletes after they transfer from JUCO to an NCAA Division I institution by limiting them to two or three years of competition—essentially a group boycott by NCAA schools against former JUCO players. At this point, the Redshirt Rule also hurts former junior college football players because it places them on an unfair playing field as compared with Division I college football players who were allowed to play in at least four Division I games (and maybe as many as nine this year) without losing a year of eligibility. Economically, the one- or two-year reduction in playing time for the former junior college player represents a one- or two-year reduction in NIL earnings. For some star players, that can be a million dollar plus reduction per year. Additionally, each year competing at the NCAA Division I level provides athletes unparalleled training and exposure that makes them desirable to professional teams and/or leagues in their chosen sport, so the eligibility restriction potentially reduces future earning potential. Finally, the NCAA frequently touts the benefits of competing in college athletics for college athletes, especially for college athletes who will not move on to professional athletics. *See, e.g.*, *The Value of College Sports*, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Nov. 3, 2024)

37

(the value of college sports includes unparalleled exposure and experiences through "the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours" which "can open doors for the few who will compete professionally and for the majority who will go pro in something other than sports.").

121.    The JUCO Bylaw Limitations deny these benefits to former JUCO college athletes for one to two seasons. The lost opportunity that comes with missing an entire college athletics season is significant, as the lost time and economic opportunity cannot be easily remedied. For athletes in the market to provide athletic services in Division I football, the impact of a missed season is even more pronounced in its effect on the athletes' future earning potential. Each game missed is a lost opportunity to showcase a college athlete's elite skills in front of national audiences and professional scouts. While some junior college players go on to NFL careers, all such players (within Plaintiffs' knowledge) first played NCAA football after junior college. Therefore, each season of missed competition causes immeasurable and irreparable harm to college athletes like Plaintiffs.

## II.    The Intercollegiate Competition Rules' Effects on Consumers

122.    The Intercollegiate Competition Rules also cause negative downstream effects on nationwide consumers who attend college football games and watch college football on television. When college athletes are prevented from competing simply because they previously attended a junior college, the value of the product that the NCAA provides to consumers is diminished. Teams may be less competitive without the ability to retain skilled transfer players for an additional season, fans lose the opportunity to see those college athletes compete for their favorite teams on gameday, and the product of NCAA athletics is less compelling for consumers.

38

## LACK OF PROCOMPETITIVE JUSTIFICATION

**I.     There is No Procompetitive Justification for the Intercollegiate Competition Rules**

123.    Because the above demonstrates the anti-competitive effect of the Intercollegiate Competition Rules on the Division I labor market for football players and the market for former Junior College football players, like Plaintiffs, and the consumer market for persons watching college football, the burden shifts to the NCAA to prove a procompetitive justification for the Intercollegiate Competition Rules.

124.    Based on its historical arguments, the NCAA may offer two potential justifications for the Intercollegiate Competition Rules.  First, the NCAA may argue the Intercollegiate Competition Rules promote the academic well-being of college athletes. Second, the NCAA may argue the Intercollegiate Competition Rules preserve the amateurism model of the NCAA. Both arguments are pretextual.

125.    In guidance to college athletes on the transfer process, the NCAA has stated that its Eligibility Clock is "designed to move student-athletes toward graduation in a timely manner." Ex. 5, 2024-25 NCAA Guide for Two Year Transfers at p. 21.  But starting a JUCO athlete's Eligibility Clock one or two years before the athlete arrives on the NCAA member institutions campus does nothing to help an athlete earn his degree.  The NCAA does not mandate how many transfer credits from a JUCO that each member institution must accept.  Indeed, JUCO transfers may have few acceptable transfer credits, forcing them to take classes over again and necessitating more semesters of school to earn a degree than the two or three years of eligibility the NCAA allows them to play football.  *See* Aldridge, D., "*Do Baseball Community College Transfers Have*

39

*a Fair Shot*"[28] at pp. 1-16 ("Oftentimes, classes may transfer as electives but may not transfer as required general education courses. It is even harder for higher level classes to transfer as they are often very different at each institution. Thus, this method can be costly to certain transfer students who wish to earn their bachelor's degree as they lose a lot of credits during the transfer process."). Indeed, "academic counselors who work directly with these [former junior college] athletes claim that NCAA bylaws make it difficult to serve this vulnerable population." *Id.* at p. 38.

126. Furthermore, the Intercollegiate Competition Rules do not aid the NCAA in maintaining consumer interest through its "amateurism model" as distinct from professional sports. As an initial matter, the NCAA has never developed a cohesive, coherent, or consistent definition of "amateurism." Regardless, nothing in the Intercollegiate Competition Rules affects the amateur status of college athletes as referenced in the NCAA Bylaws. Specifically, NCAA Bylaw 12.1.2 requires that Division I college athletes maintain amateur status to be eligible for NCAA competition.[29] This bylaw states:

> An individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual:
>
> (a) Uses athletics skill (directly or indirectly) for pay in any form in that sport;
>
> (b) Accepts a promise of pay even if such pay is to be received following completion of intercollegiate athletics participation;
>
> (c) Signs a contract or commitment of any kind to play professional athletics, regardless of its legal enforceability or any consideration received, except as permitted in Bylaw 12.2.5.1;
>
> (d) Receives, directly or indirectly, a salary, reimbursement of expenses or any other form of financial assistance from a professional sports organization based on athletics skill or participation, except as permitted by NCAA rules and regulations;
>
> (e) Competes on any professional athletics team per Bylaw 12.02.12, even if no pay or remuneration for expenses was received, except as permitted in Bylaw 12.2.3.2.1;

---

[28] (Available at file:///C:/Users/rdown/Downloads/Aldridge_unc_0153M_21643.pdf and last viewed on Nov. 6, 2024).

[29] Ex. 6 at 36.

40

(f) After initial full-time collegiate enrollment, enters into a professional draft (see Bylaw 12.2.4); or

(g) Enters into an agreement with an agent.

*Id.* Nothing in the Intercollegiate Competition Rules relates to this definition in any way. Instead, a JUCO football player is merely transferring from one school as an amateur athlete to another school as an amateur athlete. Preventing college athletes from competing in NCAA football games solely because they decided in their own best interest to start college at a non-NCAA institution has no relationship with the amateur status of those athletes. Any NCAA arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

127.     Additionally, as a matter of law, supposed benefits in the market for *consumers* of college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student athlete *labor*. Accordingly, any supposed consumer desire for college athletes to complete all post-graduate education within four or five years (of which the NCAA has presented no evidence) cannot balance against the harm caused to those students through elimination of their ability to earn NIL Compensation. Instead, the NCAA must show that the bylaws have a pro-competitive effect in the damaged market; in this case, the *labor* market for Division I college football players. Regardless, even if this cross-market balancing was legally cognizable, the JUCO Eligibility Restriction Bylaws have nothing to do with college athletes maintaining amateur status.

## II.     Any Potential Procompetitive Justifications for the Intercollegiate Competition Rules Could Be Accomplished by Less Restrictive Means

128.     Even if the academic and amateurism goals of the NCAA were valid procompetitive justifications (and they are not), both goals could be accomplished through less restrictive alternatives, some of which are already in place within the NCAA bylaws. For example, NCAA Bylaws already require college athletes to maintain progress toward degrees to be eligible to compete in NCAA events. *See* NCAA Bylaw 14.4.1. Other NCAA Bylaws require minimum credit

41

hours and grade point averages for college athletes to be eligible for competition. These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the Intercollegiate Competition Rules.

129. Additionally, minor revisions to the Intercollegiate Competition Rules themselves could maintain any procompetitive intent by the NCAA without damaging JUCO athletes. For instance, the start of the Eligibility Clock in Bylaw 12.8.1 and 12.8.1.1 could be triggered based on when the athlete first registered for classes at "an **NCAA member** institution" or a "**four year** collegiate institution" instead of when they register at a "**collegiate** institution" as in the current bylaws. Likewise, the definition of "Intercollegiate Competition" in Bylaw 12.02.6 could be changed to reference when an athlete is "in a **NCAA member** institution" or a "**four-year** collegiate institution" as opposed to "in either a **two-year or a four-year collegiate** institution" as in the current bylaws. Additionally, the line "A student who transfers to a Division I member institution from another collegiate institution shall not engage in more than four seasons of competition with not more than three of those seasons in Division I" from bylaw 14.3.3 should simply be deleted. Finally, problems caused by the Redshirt Rule could be corrected by changing the "**four** seasons" of competition listed in the Five-Year Rule (Bylaw 12.8) to "**five** seasons," allowing all athletes to compete in as many seasons as they can within five years. Thus, procompetitive justifications for the Intercollegiate Competition Rules can be accomplished through less restrictive alternatives.

## COUNT 1: VIOLATION OF SECTION 1 OF THE SHERMAN ACT: THE INTERCOLLEGIATE COMPETITION RULES

130.    Plaintiffs repeat and reallege each allegation set forth in the preceding paragraphs as if fully set forth herein.

131.    Defendant NCAA, by and through its officers, directors, employees, agents or other representatives, and its member institutions have entered an illegal agreement to restrain and suppress competition in the relevant markets through the adoption and enforcement of the Intercollegiate Competition Rules: NCAA Bylaws 12.8 (the Five Year Rule), 12.02.6 (the Intercollegiate Competition Rule), and 14.3.3 (the Three Year Transfer Limitation). Specifically, the NCAA and NCAA member institutions have agreed to unlawfully restrain the ability of Division I college athletes who transfer to the NCAA from a junior college to play for the same number of years offered to every other college football player.  The restraint imposed by the Intercollegiate Competition Rules cannot withstand analysis under the rule of reason.

132.    The market for Division I football athletic services and/or the market for former junior college football players are the relevant antitrust labor market(s). The market for viewing consumption of Division 1 football is an additional relevant market.  The transactions between NCAA member institutions and college football players in these markets are commercial in nature and fall under the purview of the Sherman Act.

133.    This unlawful agreement among horizontal competitors has unreasonably restrained competition among schools for the college athletes competing in the relevant markets, as colleges are prohibited from retaining the services of a junior college transfer, like Plaintiffs, for the four or five years they are permitted to retain the services of other college football players. This limitation disadvantages junior college football players seeking to transfer to an NCAA Division I college along with former junior college football players currently playing for an NCAA

43

Division I college, and prevents such football players from realizing the benefits of competing in NCAA Division 1 football games for the same length of time available to all other college football players, harming their current and future earning potential.

134.     As a direct result of Defendant's conduct, junior college football players seeking to transfer to an NCAA Division I college along with former junior college football players currently playing for an NCAA Division I college and consumers of college football have suffered and continue to suffer antitrust injury due to the reduction in competition among Division I schools for college athletes through the restrictions imposed by the Intercollegiate Competition Rules. Defendant's conduct is ongoing and continues to inflict direct irreparable harm on the Plaintiffs by restricting their ability to secure NIL compensation, preventing them from receiving direct payments available under the *House* Settlement, and limiting their ability to showcase their skills for professional opportunities. Unless enjoined, this unlawful restraint will continue to injure named Plaintiffs, other college athletes, and consumers of NCAA Division I football.

135.     The Intercollegiate Competition Rules yield few, if any, benefits to competition in Division I football to the NCAA's member institutions, to college football players, or to consumers of NCAA Division 1 football games contests. Any such benefits are far outweighed by the harm to competition and to the college football players who are subject to the Intercollegiate Competition Rules. Furthermore, the NCAA bylaws already contain less restrictive alternatives that accomplish the NCAA's goals for the Intercollegiate Competition Rules and/or such Bylaws could be easily modified to address such concerns.

136.     Defendant's conduct is ongoing and will continue to impose irreparable injury on current and former junior college football players and consumers of college football unless injunctive relief is granted. This ongoing harm from the Intercollegiate Competition Rules has

44

caused, and continues to cause, direct harm to Plaintiffs by restricting their ability to sign contracts for NIL Compensation and limiting their future opportunities to showcase their skills and talent for NFL personnel, and does so as an unreasonable restraint on the labor markets for college football players.

137.    Defendant and its member institutions' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

138.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs ask for a preliminary and permanent injunction enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Plaintiffs, and from enforcing NCAA Bylaw 12.11.4.2 to punish Plaintiffs, Vanderbilt University, Louisiana Tech University, UC Berkeley, University of Illinois, UCLA, University of New Mexico, Oklahoma State University, University of Tennessee, and any other NCAA member institution for actions taken in compliance with any orders from this Court.  Plaintiffs also ask the Court to explicitly rule that they are entitled to play Division I college football in the 2026-27 school year.

139.    Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiffs further request that the Court declare that Plaintiffs are entitled to compete in every season of competition occurring within their five-year eligibility window beginning on the date they each enrolled in a four-year college or university.

140.    To the extent Plaintiffs are unable to obtain injunctive relief in time for the 2026-27 season, Plaintiffs seek monetary damages to compensate them for the loss of their final year(s) of eligibility and related economic opportunities.

141.    Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiffs are entitled to

recover their reasonable attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that this Court:

1.      Adjudge and decree that Defendant's enforcement of NCAA Bylaw 12.8, 12.02.6, and 14.3.3 violates Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.      Enter a permanent injunction, in a form that the Court deems just and proper, pursuant to 15 U.S.C. § 26, enjoining Defendant from continuing to violate Section 1 of the Sherman Act by enforcing NCAA Bylaws 12.8, 12.02.6, and 14.3.3 as to Plaintiffs, and from enforcing NCAA Bylaw 12.11.4.2 to punish Plaintiffs, Vanderbilt University, Louisiana Tech University, UC Berkeley, University of Illinois, UCLA, University of New Mexico, Oklahoma State University, University of Tennessee, and any other NCAA member institution for actions taken in compliance with any orders from this Court;

3.      Allow Plaintiffs to play NCAA Division I football in 2026-27 and thereafter as if their Eligibility Clocks had started when they enrolled in a four year college and only counting Seasons of Competition incurred at four year colleges to avoid harm caused by NCAA Bylaws 12.8, 12.02.6, and 14.3.3 (and extending any player's Eligibility Clock that expired during the pendency of this lawsuit for another year);

4.      Only to the extent Plaintiffs do not receive preliminary injunctive relief allowing them to play NCAA Division 1 football in 2026-27, award Plaintiffs damages to compensate Plaintiffs for their loss of revenue sharing, loss of NIL compensation, loss of lifetime earning potential, and other damages arising from Defendant's violation of the Sherman Act;

5.      Adjudge and decree that Defendant's enforcement of the competition limitations in the NCAA Bylaws 12.8.3.1.6 and 17.11.6.2.1 violates Section 1 of the Sherman Act, 15 U.S.C. §

46

1;

6.    Award Plaintiffs their costs, including reasonable attorneys' fees; and

7.    Order any other relief that this Court deems just and proper.

Respectfully submitted,

*/s/ Ryan Downton*
Ryan Downton
Texas Bar No. 24036500
The Texas Trial Group
875 Carr 693, Ste. 103
Dorado, PR 00646*
Phone: 512-680-7947
Ryan@TheTexasTrialGroup.com
*Ryan Downton is licensed in Texas, not Puerto Rico

and

Salvador M. Hernandez (# 020121)
Riley & Jacobson, PLC
1906 West End. Ave.
Nashville, TN 37205
P: (615) 320-3700
F: (615) 320-3737
shernandez@rjfirm.com

47

## <u>CERTIFICATION OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon the

following person(s) via the ECF system on the 29th day of December 2025:

>Taylor Askew
>Holland & Knight
>511 Union St., Ste. 2700
>Nashville, TN 37219
>Taylor.askew@hklaw.com
>
>*Counsel for the NCAA*

*/s/ Ryan Downton*
Ryan Downton
